IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
CIVIL ACTION NO. _____

| | |
|---|---|
| **DR. BERND WOLLSCHLAEGER** | ) |
| | ) |
| **DR. JUDITH SCHAECHTER** | ) |
| | ) |
| **DR. TOMMY SCHECHTMAN** | ) |
| | ) |
| **AMERICAN ACADEMY OF** | ) |
| **PEDIATRICS, FLORIDA CHAPTER** | ) |
| | ) |
| **AMERICAN ACADEMY OF FAMILY** | ) |
| **PHYSICIANS, FLORIDA CHAPTER** | ) |
| | ) |
| **AMERICAN COLLEGE OF** | ) |
| **PHYSICIANS, FLORIDA CHAPTER, INC.** | ) |
| | ) |
| Plaintiffs, | ) |
| | ) **COMPLAINT FOR DECLARATORY** |
| v. | ) **AND INJUNCTIVE RELIEF** |
| | ) |
| **RICK SCOTT** | ) |
| *In his official capacity as Governor of the State* | ) |
| *of Florida* | ) |
| | ) |
| **KURT S. BROWNING** | ) |
| *In his official capacity as Secretary of State of* | ) |
| *the State of Florida* | ) |
| | ) |
| **FRANK FARMER** | ) |
| *In his official capacity as Surgeon General of* | ) |
| *the State of Florida* | ) |
| | ) |
| **ELIZABETH DUDEK** | ) |
| *In her official capacity as Secretary of Health* | ) |
| *Care Administration of the State of Florida* | ) |
| | ) |
| **LUCY GEE** | ) |
| *In her official capacity as Division Director of* | ) |
| *the Florida Department of Health, Division of* | ) |
| *Medical Quality Assurance* | ) |
| | ) |
| Defendants. | |

## <u>INTRODUCTION</u>

1.      This action seeks to protect the rights that Florida healthcare practitioners have under the First Amendment of the U.S. Constitution to engage in open and free exchanges of information and advice with their patients about ways to reduce the safety risks posed by firearms.  This action also seeks to protect the First Amendment rights of patients throughout Florida to receive such information and advice from their physicians.  The Florida law challenged in this action (hereinafter, the "Physician Gag Law") chills this speech and would punish health care professionals simply for asking questions of, and providing information to, their patients about firearm safety.  By severely restricting such speech and the ability of physicians to practice such preventative medicine, the Florida statute could result in grievous harm to children, adolescents, adults, and the elderly.  The First Amendment does not permit such a gross and content-based intrusion on speech and, accordingly, the Court should declare the Physician Gag Law unconstitutional and enjoin its enforcement.

2.      The practice of medicine requires a free and open exchange of questions, answers, and information between a patient and health care practitioner.  Indeed, for that reason, both state and federal law protect the confidentiality of such conversations.  Physicians and other health care professionals must engage in highly personal exchanges with their patients about private, confidential topics so patients understand the risks to themselves, their families, and their children arising from personal decisions they make and private conduct they engage in within their homes.  The Physician Gag law directly interferes with, and intrudes upon, health care practitioners' ability to engage fully in these consultations by severely restricting inquiries about a significant and preventable risk to patients—the risk of injury or death posed by the presence of firearms in the home.

3.      Specifically, the Physician Gag Law expressly restricts health care practitioners, in certain vaguely-defined circumstances, from asking patients questions related to gun safety or recording information from those conversations in patients' medical records, on penalty of harsh disciplinary sanctions, including fines and permanent revocation of their licenses to practice medicine.  Moreover, the statute prohibits "unnecessar[y] harass[ment]" and "discrimination" on the basis of a patient's possession or ownership of a firearm, but defines neither of those terms, leaving their definitions to the eye of the beholder.  As a result, some health care practitioners who are simply following established protocol by informing patients how they may limit the lethal risks posed by firearms may be hauled before a disciplinary board because a patient who categorically objects to *any* discussion or inquiry regarding such risks claims to be offended.

4.      Thus, in addition to establishing express prohibitions on protected speech, the Physician Gag Law is also so vague, and its sanctions so severe, that it chills health care practitioners' discussions of gun safety with their patients even in situations arguably permitted by the law.  Fearing the prospect of professionally devastating public disciplinary proceedings, practitioners are left to assume the law's vague speech prohibitions will be construed to prohibit, and therefore will self-censor, their speech regarding how patients can best minimize the risks of injury and death associated with gun ownership.

5.      The Physician Gag Law consequently not only will deprive physicians and other health care practitioners of their First Amendment right to freedom of speech, but also will deprive patients of their First Amendment rights to receive potentially life-saving information regarding safety measures they can take to protect their children, families, and others from injury or death resulting from unsafe storage or handling of firearms.

6.     By restricting the free and open exchange of information between a physician and patient in this manner, the Physician Gag Law violates the First and Fourteenth Amendments to the U.S. Constitution.   Accordingly, Dr. Bernd Wollschlaeger, Dr. Judith Schaechter, Dr. Tommy Schechtman, the Florida Chapter of the American Academy of Pediatrics ("FAAP"), the Florida Chapter of the American Academy of Family Physicians ("FAFP"), and the Florida Chapter of the American College of Physicians ("FACP") (collectively, "Plaintiffs") on their own behalf, on behalf of their more than 11,000 collective members (collectively, "health care practitioners" or "practitioners"), and on behalf of their patients, herewith seek declaratory and injunctive relief prohibiting enforcement of the provisions of Florida Statutes sections 381.026, 395.1055, 790.338 and 456.072 amended or created by CS/CS/HB 155, entitled "An act relating to the privacy of firearm owners" (the "Physician Gag Law").   Plaintiffs have sustained immediate and irreparable harm to their free speech rights from these provisions and, therefore, seek a declaration that the Physician Gag Law is unconstitutional and an injunction against its enforcement.

## JURISDICTION AND VENUE

7.     This action is brought pursuant to 42 U.S.C. § 1983 to redress the deprivation, under color of state law, of rights secured by the Constitution of the United States.

8.     This Court has jurisdiction over this action under 28 U.S.C. § 1331 (federal question), and it may issue a declaratory judgment and grant further relief pursuant to 28 U.S.C. §§ 2201 and 2202.

9.     Venue appropriately lies in this District pursuant to 28 U.S.C. § 1391.

10.     Because the Physician Gag Law constitutes an immediate infringement on the free speech rights of Plaintiffs, their members, and their patients, an actual and justiciable controversy exists between Plaintiffs and Defendants.

11.     Plaintiffs have standing to bring this action.

<u>**PARTIES**</u>

12.     Plaintiff Dr. Bernd Wollschlaeger is a physician specializing in family medicine and addiction medicine.  He is licensed to practice medicine in Florida and is Board-certified in Family Medicine and Addiction Medicine.   He resides in Miramar, Florida, and practices medicine from an office located in North Miami Beach, Florida.  He is a member of FAFP and currently serves on its Board of Directors.

13.     Plaintiff Dr. Judith Schaechter is a physician specializing in pediatric medicine. She is licensed to practice medicine in Florida and is Board-certified in Pediatric Medicine.  She resides in Miami Beach, Florida, and practices medicine in the City of Miami, Florida.  She is a member of FAAP and is Chair of FAAP's Child Safety Committee.

14.     Plaintiff Dr. Tommy Schechtman is a physician specializing in pediatric medicine.  He is licensed to practice medicine in Florida and is Board-certified in Pediatric Medicine.  He resides and practices medicine in Palm Beach Gardens, Florida.  He is a member of FAAP, serves on its Board of Directors, and is Secretary of FAAP.

15.     Plaintiff American Academy of Pediatrics, Florida Chapter ("FAAP"), also known as the Florida Pediatric Society, is a non-profit professional organization of pediatricians and pediatric specialists, incorporated under the laws of Florida, with over 1,600 members throughout the State of Florida, including Miami-Dade County.  The mission of FAAP and its members is to improve access to, and the quality of, heath care for infants, children, and young

adults in Florida.  FAAP promotes the health and welfare of, and advocates for, Florida's infants, children and young adults.

16.     Plaintiff American Academy of Family Physicians, Florida Chapter ("FAFP"), also known as the Florida Academy of Family Physicians, Inc., is composed of more than 4,000 family medicine physicians, residents, and medical students throughout the State of Florida, including Miami-Dade County.  Incorporated under the laws of Florida, FAFP works to advance the specialty of family medicine by promoting excellence and improvement in the health care of all Floridians, including helping all Floridians understand that having a family physician is vital to their health.  FAFP also acts as a voice for family medicine, engaging in advocacy on key issues among patients and the medical community.

17.     Plaintiff American College of Physicians, Florida Chapter, Inc. ("FACP") is the Florida chapter of the American College of Physicians ("ACP"), a national organization of internists, who are physicians specializing in the prevention, detection, and treatment of illnesses in adults.  Incorporated in Florida, FACP has approximately 5,800 members cross the State of Florida, including Miami-Dade County.  The mission of FACP is to enhance the quality and effectiveness of health care by fostering excellence and professionalism in the practice of medicine.  FACP's goals in furtherance of this mission include establishing and promoting the highest clinical standards and ethical ideals; serving as the foremost comprehensive education and information resource for all internists; advocating responsible positions on behalf of its members; and promoting research to enhance the quality of practice, the education, and continuing education of internists.  FACP also cooperates with ACP in publishing, promoting, and disseminating practice guidelines, policy statements, and academic and professional literature relating to best practices in internal medicine.

18.     Defendant Rick Scott is sued in his official capacity as the Governor of the State of Florida.  Mr. Scott signed the Physician Gag Law on June 2, 2011.  Under Florida law, Mr. Scott has the power to appoint the Surgeon General and the Secretary of Health Care Administration, both of whom serve at the pleasure of the Governor.  *See* Fla. Stat. § 20.43(2)(a), 20.42(2).  Mr. Scott also appoints the members of each board within the Florida Department of Health's Division of Medical Quality Assurance, including the Board of Medicine.  *See id.* § 20.43(4)(a).

19.     Defendant Kurt S. Browning is sued in his official capacity as Secretary of State of Florida.  Under Florida law, Mr. Browning's responsibilities include maintaining custody of the original statutes of Florida, resolutions of the Florida legislature, and all official correspondence of the Governor of Florida.  Mr. Browning also maintains an index of all orders and official acts issued or received by the Governor or himself.  *See* Fla. Stat. § 15.01.

20.     Defendant Frank Farmer is sued in his official capacity as the State Surgeon General of Florida.  Under Florida law, Mr. Farmer's responsibilities include leading the Florida Department of Health ("Department") and regulating physicians and other health professionals as authorized by law.  *See* Fla. Stat. §§ 20.43, 381.026, 456.072, 790.338.  The Department has investigative and disciplinary powers and may impose penalties for violations of the Physician Gag Law under Florida law.  *Id.*

21.     Defendant Elizabeth Dudek is sued in her official capacity as Secretary of Health Care Administration of the State of Florida.  Under Florida law, Ms. Dudek is the head of the Agency for Health Care Administration ("Agency"), and her responsibilities include health facility licensure, inspection, and regulatory enforcement and investigation of consumer complaints related to health care facilities.  *See* Fla. Stat. §§ 20.42, 381.026, 395.1055, 790.338.

The Agency has regulatory and enforcement powers and may impose penalties for violations of the Physician Gag Law under Florida law.

22.     Defendant Lucy Gee is sued in her official capacity as Division Director of the Florida Department of Health, Division of Medical Quality Assurance ("Division").   Under Florida law, Ms. Gee's responsibilities include the administration of various boards and professions, including the Board of Medicine, and their associated investigation, enforcement, and disciplinary powers concerning physicians and other health professionals.  *See* Fla. Stat. §§ 20.43, 456.072, 790.338.   The Division has investigative and disciplinary powers and may impose penalties for violations of the Physician Gag Law under Florida law.  *Id.*

## FACTUAL BACKGROUND

**A.      Necessity of Safety Counseling as Preventative Medicine**

23.     Intentional injury, resulting from behaviors designed to hurt oneself or others, is a major health hazard for children and adults of all ages.  Suicide is a particularly significant risk about which physicians and other health care practitioners must routinely counsel patients.  In the United States, suicide is the third-leading cause of death for individuals below the age of 21 and the second-leading cause of death for adults aged 25 to 34.  The highest rate of suicide for women occurs in their 40s and 50s; and, for men, the highest rate is among those age 75 or older.  Firearms frequently are used in such suicides and suicide attempts.

24.     Unintentional injury is also a health hazard for patients of all ages, and, indeed, is the leading cause of death and morbidity among children older than one year, adolescents, and young adults.  Such injuries arise from many causes, including falls, burns, poisoning, choking, drowning, recreational activities, sports—and accidents involving firearms.

25.     In light of these risks, prevention of unintentional and intentional injury is a life-long aspect of preventative care, stretching from before birth all the way to old age. Preventative care is a pillar of the practice of medicine. In a modern rendition of the Hippocratic Oath, administered across the country, a physician swears to "prevent disease whenever I can, for prevention is preferable to cure." Dr. Louis Lasagna, "Would Hippocrates Rewrite His Oath?," *New York Times Magazine* (June 28, 1964). Along with preventing the onset of disease, a crucial element of practicing medicine is the prevention of intentional and unintentional physical injuries. Health care practitioners play a key role in counseling patients, their parents, and other caregivers about the risks of injuries and best practices to minimize those risks.

26.     To those ends, the American Academy of Pediatrics ("AAP") and FAAP recommend preparing a child-safe home before a child is born, and that pediatricians' anticipatory guidance on household safety issues begin after an infant is 2 days old. Such anticipatory guidance on minimizing these risks is a major component of well-child care and preventative medicine, and is recommended by AAP as an integral part of the medical care provided for all infants, children, and adolescents. Indeed, AAP has established a nation-wide initiative, The Injury Prevention Program ("TIPP"), with the aim of helping health care professionals counsel parents and children about adopting behaviors that can prevent injuries and has published age-specific clinical guidance on injury prevention for pediatricians. Both AAP and FAAP encourage health care practitioners to document injury-prevention counseling in a patient's medical chart. Injury prevention continues into adulthood and beyond for the elderly.

27.     As Plaintiffs and health care practitioners everywhere are well aware, firearms contribute to both intentional and unintentional injuries and deaths for patients of every age. Every year, thousands of Americans are seriously injured or killed when a child finds a gun and

accidentally pulls the trigger, an argument between acquaintances or family members spins out of control, or a depressed teenager or adult becomes suicidal.  Suicide attempts committed with guns are fatal more than 90% of the time.  Use of a firearm is the most common method of suicide among men—56.8%, as of 2007.

28.    Firearms pose particular risks in households with children.  Every day in America 65 children and teens are shot with firearms, and eight of them die.  One third of U.S. homes with children younger than eighteen have a firearm.  More than 40 percent of gun-owning households with children store their guns unlocked and one quarter of those homes store them loaded.

29.    Each year, Florida children are harmed when they or other children gain access to firearms that have not been stored properly.  Florida's overall gun death rate is higher than the national average.  From 1999 to 2007, 1,195 children and teens in Florida were shot and killed with firearms.  In a mere two-month span last year, from February 8, 2010 through March 26, 2010, four Florida children died from injuries accidentally inflicted by firearms.  In one incident, an 11-year-old boy died after accidentally being shot in the face by his little brother; the boys had been sent to the parking lot outside their home to retrieve a hat from their father's truck, and, while searching for it, the 10-year-old found a gun and shot and killed his brother.  Janie Campbell, "Boy Accidentally Kills Brother With Dad's Gun," *NBC Miami*, February 28, 2010. In another, a 2-year-old girl accidentally shot herself with a .380 caliber semi-automatic handgun she found on the nightstand next to her mother's bed.  Steve Nichols, "Arrest in toddler's accidental shooting," *Fox 13 Pinellas*, March 27, 2010.  A 15-year-old boy was shot once in the head by another minor inside a home.  Anika Myers Palm, "15-year-old boy accidentally shot in head in gun-playing incident," *Orlando Sentinel*, February 8, 2010.   And a 17-year-old

accidentally shot his friend at home while twirling a handgun on his finger.  Associated Press, "Florida Teen Accidentally Shoots Friend While Twirling Gun," *Fox News*, March 6, 2010.

30.     Anticipatory safety guidance regarding firearms is thus a crucial part of the practice of preventative medicine in Florida.

31.     AAP and FAAP recommend that health care practitioners tailor their recommendations to patients' circumstances.  *See* H. Garry Gardner and the Committee on Injury, Violence, and Poison Prevention, "Office-Based Counseling for Unintentional Injury Prevention," 119 *Pediatrics* 202 (Jan. 2007) (describing measures appropriate to infants, preschool-aged children, school-aged children, and adolescents, with regard to risks posed by sleep environments, choking, traffic, poisons, falls, burns, water and drowning, sports, and firearms).  For parents of preschool-aged children, because of the dangers that in-home firearms, particularly handguns, pose to young children, AAP and FAAP recommend that parents should be advised to keep handguns out of places where children live and play.  If parents choose to keep a firearm in the home, the unloaded gun and ammunition must be kept in separate locked cabinets.

32.     For parents of school-aged children, AAP and FAAP recommend advising parents that, in addition to removing firearms from the home environment where children explore and play, parents should also ask whether there is a gun in any home that their children visit.  If parents choose to keep a firearm in the home, the unloaded gun and ammunition must be kept in separate locked cabinets.

33.     With respect to adolescents, AAP and FAAP recommend that health care practitioners inform parents that in-home firearms are particularly dangerous during adolescence because of the potential for impulsive, unplanned use by teens resulting in suicide, homicide, or

serious unintentional injuries.  They recommend that firearms, and especially handguns, should be kept out of the home for parents of adolescents at risk of suicide.  If parents choose to keep a firearm in the home, the unloaded gun and ammunition must be kept in separate locked cabinets. Parents should ask whether there is a gun in any home that teenagers visit.

34.     Consultations regarding firearm safety are also a routine part of adult medical care, help adult patients minimize heath hazards, and are particularly important in the context of treating mental health conditions.  The American Psychiatric Association has recommended that "health professionals and health systems should ask about firearm ownership whenever clinically appropriate in the judgment of the physician."

35.     These recommendations are derived from medical and scientific studies, and Plaintiffs and their members view them as a key part of minimizing risks that firearms pose to the health of children, adolescents, adults, and their family members.  Plaintiffs counsel their patients regarding these preventative measures as part of the recommended anticipatory safety guidance and medical care.  Such consultations frequently involve engaging patients in a dialogue about the preventative measures, both in order to inculcate and reinforce physicians' medical advice and in order to tailor this advice to the patients' particular circumstances.  In addition, in an attempt to further reinforce such guidance, AAP has produced literature available for distribution by Florida health care practitioners, including fact-sheets patients can take home with them describing how to mitigate the risks posed by firearms.

36.     This aspect of preventative care—counseling patients on firearm safety—also directly assists Florida parents in complying with Florida's firearms laws, including a law passed by the Florida Legislature specifically to protect children.  Florida law requires that a person who has stored a firearm, "and who knows or reasonably should know that a minor is likely to gain

access to the firearm" "shall keep the firearm in a securely locked box or container or in a location which a reasonable person would believe to be secure or shall secure it with a trigger lock." Fla. Stat. § 790.174(1).  Failure to secure a firearm in this fashion is a misdemeanor.  *Id.* § 790.174(2).  The Florida Legislature passed this law upon "find[ing] that a tragically large number of Florida children have been accidentally killed or seriously injured by negligently stored firearms; that placing firearms within the reach or easy access of children is irresponsible, encourages such accidents, and should be prohibited; and that legislative action is necessary to protect the safety of our children."  *Id.* § 790.173(1).

**B.      The Physician Gag Law**

37.      Each of the Physician Gag Law's four main provisions imposes a restriction on health care practitioners' speech on the particular subject matter of firearms.  The law, entitled "An act relating to the privacy of firearm owners," purports to protect the "privacy" of Florida firearm owners.  It does not, in fact, advance firearms' owners rights under the Second Amendment to the U.S. Constitution.  Owners of firearms in Florida remain subject to, for instance, the Florida statute requiring safe storage of firearms in homes with children, described above.  *See* Fla. Stat. § 790.174.  Rather than furthering a right to *bear* arms, the Physician Gag Law restricts *discussion* of firearms.

38.      First, the Physician Gag Law restricts health care practitioners and facilities from "making a written inquiry or asking questions concerning" particular subjects: "the ownership of a firearm or ammunition by the patient or by a family of a member of the patient," and "the presence of a firearm in a private home or other domicile of the patient or a family member of the patient."  Fla. St. §§ 790.338(2), 381.026(4)(b)(8).  The law carves out an exception if the

practitioner or facility "in good faith believes that this information is relevant to the patient's medical care or safety, or the safety of others." *Id.* §§ 790.338(2), 381.026(4)(b)(8).

39.     Second, the Physician Gag Law restricts practitioners from writing information on the subject of "firearm ownership" in patients' medical records, thus restricting written communication among practitioners within a health care facility on the subject of preventative care related to firearm ownership.  The statute prohibits health care practitioners and facilities from "intentionally enter[ing] any disclosed information concerning firearm ownership into the patient's medical record if the practitioner knows that such information is not relevant to the patient's medical care or safety, or the safety of others." Fla. Stat. § 790.338(1).

40.     With respect to these first two provisions, the Physician Gag Law does not specify what constitutes "relevan[ce] to the patient's medical care or safety, or the safety of others" for purposes of the statute.  As a consequence, practitioners are left uncertain as to those situations in which they are prohibited from making inquiries of their patients regarding the presence or ownership of a firearm, or entering such information into patients' records.

41.     Another provision of the Physician Gag Law, governing emergency medical technicians ("EMTs"), sets a high standard for "relevance."  The statute authorizes EMTs to inquire about a patient's possession of a firearm or the presence of a firearm in the home, but only if the EMT "in good faith believes that [such] information … is necessary to treat a patient during the course and scope of a medical emergency or that the presence or possession of a firearm would pose an imminent danger or threat to the patient or others."  Fla. Stat. § 790.338(3).

42.     The statute nowhere specifies whether the standard for "relevance" that would permit a health care practitioner to make inquiry about or record information regarding the

presence or ownership of guns in the home is similarly limited to circumstances where such information relates to a "medical emergency" or "imminent danger or threat."

43.     The Physician Gag Law's third main restriction on health care practitioner's speech is its prohibition of "unnecessarily harassing" patients on the subject of "firearm ownership."  *See* Fla. Stat. § 790.338(6), 381.026(4)(b)(11).  Although the provision does not define "harassment," under any natural reading of the statute (however narrow or broad), such "harass[ment]" would largely or entirely consist of a practitioner's speech regarding firearms directed to a patient.

44.     Although some patients might perceive as "harassment" an inquiry that another patient welcomes, the Physician Gag Law provides no guidance regarding what kind of conduct would subject a practitioner or facility to disciplinary proceedings for having engaged in harassment.  Any individual patient who feels "harassed" by a practitioner's questions related to gun safety can report a practitioner for violating the Physician Gag Law.

45.     Fourth, the Physician Gag Law prohibits "discriminat[ion]" "based solely upon the patient's exercise of the constitutional right to own and possess firearms or ammunition." *See* Fla. Stat. §§ 790.338(5), 381.026(4)(b)(10).  Because the meaning of this prohibition is wholly unclear, it imposes a further burden on, and further serves to restrict, practitioners' speech directed to patients regarding the subject matter of firearms.

46.     The Physician Gag Law subjects health care practitioners and facilities accused of violating the statute to disciplinary proceedings and potentially harsh penalties, such as investigation and enforcement of sanctions by the Department, Division, Agency, or applicable professional board.  *See* Fla. Stat. §§ 790.338(8), 395.1055, 456.072(1)(mm), 456.072(2).  These sanctions include, but are not limited to, revocation of their licenses to practice medicine,

imposition of administrative fines of up to $10,000 per count or offense, return of fees collected, issuance of letters of reprimand, and compulsory remedial medical education. *See, e.g.,* Fla. Stat. § 456.072(2).

47.      The disciplinary proceedings and penalties to which the Physician Gag Law subjects health care practitioners for their speech about gun safety are otherwise reserved for egregious professional misconduct—such as obtaining a license through bribery, making fraudulent representations related to the practice of medicine, and filing false complaints against other practitioners. *See* Fla. Stat. § 456.072.

**C.      Harm to Plaintiffs and Their Patients**

48.      The Physician Gag Law expressly prohibits health care practitioners from making certain inquiries to patients on the subject of firearm safety, expressly prohibits them from writing certain notes in patients' charts regarding their consultations on this topic, and has an immediate restrictive effect on Plaintiffs' exercise of their constitutional right to speak freely to their patients, in the exercise of their best medical judgment, regarding safe gun ownership.

49.      To be sure, Plaintiffs discuss safe gun ownership with patients only because they believe such information to be "relevant" to patients' medical care or safety, and Plaintiffs record information regarding such counseling in patients' charts as a matter of course in the belief that doing so is "relevant" to patients' care.  But it is unclear how the Physician Gag Law will be interpreted or applied by disciplinary bodies, and the law encourages complaints to be brought against Plaintiffs, even in circumstances in which Plaintiffs believe they would be constitutionally protected in speaking with their patients about gun safety.  The risks posed by common household hazards to infants, children, and adolescents—including risks posed by the presence of firearms—warrant counseling *every* young patient's parents regarding these risks.

To that extent, it is therefore always "relevant" to inquire as to the presence or ownership of a firearm in the home, and to document such information in patients' medical records along with other information pertinent to patients' preventative care.  It is far from clear, however, whether this level of non-particularized "relevance" will be deemed by the Board of Medicine to be sufficient to avoid punishment for violating the Physician Gag Law.  Indeed, the more specific safe harbor provision applicable to EMTs gives Plaintiffs a very concrete basis to fear that the statute will be construed to prohibit inquiring or entering information except in circumstances related to a medical emergency or imminent threat to health or safety.

50.    The Physician Gag Law's ambiguous prohibitions against "harassment" and "discrimination" based on gun ownership have a similar chilling effect on health care practitioners' speech on the subject of firearm safety.  Plaintiffs do not view their counseling as "harassment" or "discrimination."  Nevertheless, one patient may regard as "harassment" an inquiry and discussion of gun safety that another patient would welcome.  The Physician Gag Law's prohibitions are so vague, overbroad, and ambiguous, and its penalties so harsh, that prudent practitioners will be forced to curtail or forgo altogether counseling patients with regard to firearms.

51.    This silencing will occur because the process of public investigation before the Department or an applicable professional board, usually reserved for egregious cases of misconduct, is so harmful to medical professionals' reputations that even practitioners who are eventually vindicated are irreparably harmed; the harm commences along with the mere investigation.  For example, many accrediting organizations and job applications require physicians to disclose whether they have ever been reported to their state medical boards— regardless whether they were ultimately vindicated.  The threat posed by the spectre of being

reported under this vague, overbroad, and ambiguous statute, which can be done by any individual patient, is thus sufficient to cause health care practitioners to limit their speech to patients with respect to firearms or to refuse altogether to counsel patients on this topic.

52.     For example, Plaintiff Dr. Bernd Wollschlaeger considers anticipatory guidance regarding safe firearm practices to be a key part of preventative health consultations, in light of the significant health risks posed by firearms to his patients.  Until passage of the Physician Gag Law, all of his patients have been asked to complete a preventative-health-related questionnaire aimed at uncovering specific risk factors, which Dr. Wollschlaeger uses as the basis for taking a more in-depth, individualized patient history.   Heretofore, it has also been his practice to ask patients about firearm ownership and safe firearm storage if the patients' circumstances suggest that access to guns potentially could result in harm to the patient or others, and he has documented in children's charts that their parents have been asked a question on the topic of firearms as part of their preventative health screening.  Nevertheless, the possibility of having to appear before the Florida Board of Medicine based on a complaint that he violated the Physician Gag Law has caused and will continue to cause Dr. Wollschlaeger to refrain from discussing firearms as part of his standard preventative counseling as a precautionary measure, because of the devastating damage to his professional reputation and business, as well as expense and personal stress, that would result if such proceedings were brought against him.

53.     Plaintiff Dr. Judith Schaechter also has been forced to curtail her speech with patients on the subject of firearms as a result of the Physician Gag Law.  Dr. Schaechter routinely screens her patients for firearm safety risks during their annual visits for well-child care.  And, as she does with respect to other aspects of her patients' care, she records information regarding firearm ownership in her patients' medical records.  She views doing so as important,

because such records communicate to a limited number of doctors within her practice the discussion that took place with the patient or parent; they document the preventative care that was given; and they allow her, as a child grows older, to look back and know what topics she may need to verify, cover again, or expand upon.  She is afraid the Physician Gag Law could be interpreted as allowing doctors to ask about guns only if they believe a danger to the patient is imminent—an interpretation that would preclude this aspect of standard preventative care for her patients.  Nevertheless, because she believes in good faith that such questions are relevant to her patients' health care, she is continuing to ask these routine screening questions following the law's enactment, despite her immediate fear that a patient, spurred by this law, may as a result make a report against her to the Board of Medicine.  Because of this fear that she may be accused of violating the Physician Gag Law, she has, however, decided that she will now alter her practice with respect to patients' parents who avoid answering or respond with hostility to questions regarding firearms—despite the fact that such counseling on this subject may be necessary to protect the patients' safety.  Whereas before this law was passed she would ask such parents follow-up questions when they avoided answering or responded with hostility to questions about firearms, she now will forgo such follow-up questions, for fear of being accused by the patient of violating this law.

54.    Plaintiff Dr. Tommy Schechtman, like Dr. Schaechter, will continue in his practice of routinely asking his patients questions regarding firearm safety and recording related information in their medical records, because he believes in good faith that such questions and information are relevant to his patients' medical care.  Also like Dr. Schaechter, however, as a result of the Physician Gag Law, Dr. Schechtman will refrain from asking follow-up questions when patients or their parents seem upset by his initial screening question.  Although he

previously did ask patients and their parents such follow-up questions due to the possibility of firearms in such households and the need for preventative guidance regarding safely storing them, Dr. Schechtman now is concerned that such follow-up questions will lead to his being accused of violating the Physician Gag Law. Even though Dr. Schechtman will censor his own speech to this extent as a result of the enactment of the Physician Gag Law, he remains extremely concerned that a patient or parent, prompted by the law, will file a complaint against him with the Board of Medicine based simply on the fact that he has asked a standard screening question regarding the presence of firearms in the patient's household.

55.      It is no answer to Plaintiffs' fear of being accused of violating this law to assert that they can simply advise their patients on firearm safety without asking their patients any questions. Health care practitioners cannot provide meaningful counseling on firearm safety without making "inquiries" of their patients. Most importantly, such counseling, to be effective, requires a back-and-forth between patient and practitioner. In an exam room, patient care is by definition personal; assessment of health, safety, and risk, as well as management of the same, is customized for each patient. It would be poor practice to provide anything less, and health care practitioners are not effective when they simply lecture their patients or hand them a pamphlet. Rather, practitioners converse with their patients, in an attempt to cultivate a relationship of trust, honesty, and collaboration. This is as true for adolescent diabetes management as it is for child safety regarding firearm access. Furthermore, for those patients who do not have firearms in their home, much of what a practitioner would say to a family about possessing firearms would be irrelevant. "Counseling" that consisted simply of lecturing such patients on storing their firearms therefore would waste both practitioners' and patients' time, and would cause patients to question their practitioners' judgment in discussing at length information irrelevant to their

lives and health.  Even more fundamentally, the First Amendment does not permit the State of Florida to require practitioners to conform their communications with their patients to the State's preferences.

56.     Likewise, the law also effectively disables Plaintiffs from communicating with patients through their member physicians and through relevant literature created for distribution to patients.

57.     Preventing health care practitioners from counseling their patients on all aspects of the recommended safety guidance deprives patients of their right to hear such information. Such brief counseling efforts by practitioners can make a significant positive impact on patients' firearm storage habits.  The absence of those efforts undoubtedly will contribute to further injuries and loss of lives.

58.     Dr. Wollschlaeger, for instance, previously routinely asked about firearm ownership and safe firearm storage if access to guns could potentially result in harm to the patient or others—for example, where patients have children at home; are suffering from addiction, depression, or suicidal ideations; have an unstable family environment; or are involved in a domestic violence situation.  Thus, before the enactment of the Physician Gag Law, if he were treating children and learned from their mother that their father owned guns and had an explosive temper, he would make inquiries of the husband regarding firearms safety as a preventative health measure.  He frequently shared with adult patients and minor patients' parents that he himself is a gun owner and concealed weapon permit-holder, and he has explained to them the steps he takes to ensure his gun is properly secured.  He also has discussed with them the need to secure their guns from inadvertent use by third parties, avoiding accidental discharge, and keeping guns out of children's access.  In Dr. Wollschlaeger's experience, many

patients and parents are unaware of how to use child safety mechanisms and lock boxes and the importance of separately storing guns and ammunition.  Such patients and parents have been appreciative of learning more regarding how they can minimize the risks of physical injury and death stemming from their ownership of firearms.  But Dr. Wollschlaeger no longer will discuss firearms as part of his standard preventative counseling, for fear of being accused of violating the Physician Gag Law—thus increasing the risk of firearm injuries for his patients and others in their households.

59.     Plaintiff Dr. Schaechter's experience has been that asking about firearms in the home prompts discussions with patients and parents.  She has found that, following these counseling sessions, many parents take her advice and implement measures that can prevent accidents, because they want to protect their children.  Sadly, however, she also has lost many patients to gunshot wounds, including in incidents where guns found in a child's home or belonging to a family member inflicted the wounds.  Dr. Schaechter views these injuries as preventable.  She is concerned that undermining anticipatory safety guidance regarding firearms may lead to more preventable deaths and grievous injuries to patients.

60.     Plaintiff Dr. Schechtman also has found in his experience that his patients' level of knowledge regarding firearm safety varies.  He believes that his practice of providing preventative guidance on firearm safety has been informative, has changed behavior, or even has prevented serious injury or death for many of his patients.  He occasionally has had experience in the past with patients becoming upset by follow-up questions when patients did not respond to a question regarding firearm safety on a written questionnaire that he gives patients, which asks about firearms among many other risk factors.  Recently, a 16-year-old patient became upset when a nurse practitioner in his practice asked the patient a follow-up question in response to the

ASTIGARRAGA DAVIS MULLINS & GROSSMAN, P.A.

patient's failure to respond to the question about firearms.  Because of the enactment of the Physician Gag Law, Dr. Schechtman now will refrain from asking such follow-up questions in similar circumstances, out of the fear that he will be accused of violating the law.

61.     Members of FAAP, FAFP, and FACP, including Dr. Wollschlaeger (FAFP), Dr. Schaechter (FAAP), Dr. Schechtman (FAAP), Dr. Lisa A. Cosgrove (FAAP), Dr. Stuart Himmelstein (FACP), and Dr. Dennis Mayeaux (FAFP), also will, as a result of the Physician Gag Law, curtail, modify, or cease altogether speech in which they otherwise would engage with patients as part of their medical care.

62.     In light of the foregoing, Plaintiffs FAAP, FAFP, and FACP submitted a letter to Defendant Scott on May 27, 2011, formally requesting that he veto the Physician Gag legislation because it is unconstitutional.  Notwithstanding that request, Defendant Scott signed the Physician Gag Law into law on June 2, 2011.

## CLAIM FOR RELIEF

### COUNT I: VIOLATION OF 42 U.S.C. § 1983

63.     Plaintiffs reallege and incorporate by reference the preceding allegations in paragraphs 1 through 62 as though fully set forth herein.

64.     The First Amendment to the U.S. Constitution provides that "Congress shall make no law . . . abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances."  The First Amendment is applicable to the States under the Fourteenth Amendment to the U.S. Constitution.

65.      The Fourteenth Amendment provides that "[n]o state shall . . . deprive any person of life, liberty, or property, without due process of law."

66.     The Physician Gag Law violates the First and Fourteenth Amendments:

(a)      By abridging the freedom of Plaintiffs Dr. Bernd Wollschlaeger, Dr. Judith Schaechter, Dr. Tommy Schechtman, FAAP, FAFP, and FACP, and of their members, to communicate with and to counsel their patients, using their best medical judgment in practicing preventative medicine, regarding minimizing the risks associated with firearms;

(b)      By failing to give Plaintiffs Dr. Bernd Wollschlaeger, Dr. Judith Schaechter, and Dr. Tommy Schechtman and the members of Plaintiffs FAAP, FAFP, and FACP adequate notice of the conduct prohibited under the Physician Gag Law; and

(c)      By abridging the freedom of Plaintiffs' and their members' patients to receive such information as part of their preventative care.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in their favor and that the Court:

(A)  Declare that the Physician Gag Law violates the First and Fourteenth Amendments to the Constitution of the United States;

(B)  Preliminarily and permanently enjoin Defendants from enforcing the Physician Gag Law;

(C)  Award Plaintiffs the costs incurred in pursuing this action, including attorneys' fees pursuant to 42 U.S.C. § 1988, and reasonable expenses; and

(D)  Grant such other and further relief as the Court deems proper.

ASTIGARRAGA DAVIS MULLINS & GROSSMAN, P.A.

Dated:  June 6, 2011                    Respectfully submitted,


                                        _/s/ Edward M. Mullins_____
                                        Edward M. Mullins (Fla. Bar No. 863920)
                                        emullins@astidavis.com
                                        Hal M. Lucas (Fla. Bar No. 853011)
                                        hlucas@astidavis.com
                                        ASTIGARRAGA DAVIS MULLINS
                                            & GROSSMAN, P.A.
                                        701 Brickell Avenue, 16th Floor
                                        Miami, Florida  33131-2847
                                        Telephone:  (305) 372-8282
                                        Facsimile:  (305) 372-8202

                                        -and-

                                        Bruce S. Manheim, Jr.*
                                        bruce.manheim@ropesgray.com
                                        Douglas H. Hallward-Driemeier*
                                        driemeier@ropesgray.com
                                        Augustine M. Ripa*
                                        augustine.ripa@ropesgray.com
                                        Julia M. Lewis*
                                        julia.lewis@ropesgray.com
                                        ROPES & GRAY LLP
                                        700 12th Street NW, Suite 900
                                        Washington D.C. 2005
                                        Telephone:   (202) 508-4600
                                        Facsimile:  (202) 383-8332

                                        -and-

                                        Jonathan E. Lowy *
                                        jlowy@bradymail.org
                                        Daniel R. Vice*
                                        dvice@bradymail.org
                                        BRADY CENTER TO PREVENT
                                            GUN VIOLENCE
                                        Legal Action Project
                                        1225 Eye Street, NW
                                        Suite 1100
                                        Washington, DC 20005
                                        Telephone:  (202) 289-7319
                                        Facsimile:   (202) 898-0059

-and-

Dennis G. Kainen (Fla. Bar No. 0339393)
WEISBERG & KAINEN P.L.
1401 Brickell Avenue
Suite 800
Miami, Florida  33131-3504
Telephone:  (305) 374-5544
Facsimile:   (305) 358-8565
dennis@weisbergandkainen.com

*Pro hac vice applications pending*

*Counsel for Plaintiffs*