## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### Case No. 11-22026-Civ-COOKE/TURNOFF

BERND WOLLSCHLAEGER, *et al*.,

      Plaintiffs

vs.

FRANK FARMER, *et al*.,

      Defendants.

_____/

### ORDER GRANTING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

THIS MATTER is before me on the Plaintiffs' Motion for Preliminary Injunction. (ECF No. 16). On July 13, 2011, I held a hearing on the Motion. I have reviewed the arguments, the record, and the relevant legal authorities. For the reasons provided in this Order, the Motion is granted.

### I. BACKGROUND

On June 2, 2011, Governor Rick Scott signed into law "[a]n Act relating to the privacy of firearm owners" (hereinafter, "Firearm Owners' Privacy Act"). CS/CS/HB 155 (codified at Fla. Stats. §§ 790.338, 381.026, 456.072, 395.1055). The bill created Fla. Stat. § 790.338, entitled "Medical privacy concerning firearms," and amended other scattered statutes.

Pursuant to § 790.338, licensed health care practitioners or facilities (collectively, "practitioners") may not (i) intentionally record any disclosed information concerning firearm ownership in a patient's medical record if the practitioner knows the information is not relevant to the patient's medical care or safety, or the safety of others (the "record-keeping provision"); (ii) ask a patient whether she owns a firearm unless the practitioner in good faith believes the information is relevant to the patient's medical care or safety, or the safety of others (the "inquiry restriction provision"); (iii) discriminate against a patient based solely on firearm ownership (the "anti-

discrimination provision"); or (iv) unnecessarily harass a patient about firearm ownership (the "anti-harassment provision").[1]  Violation of any provision of the law constitutes grounds for disciplinary action under Fla. Stats. §§ 456.072, 395.1055.

**A.  Legislative History and State's Clarification of the Law**

According to the State's legislative findings, the State passed the law in reaction to an incident in Ocala, Florida, where a physician advised the mother of a minor patient that she had thirty days to find a new pediatrician after the mother refused to answer questions about firearms in her home.  Fla. Health & Human Servs. Comm., H.R. Staff Analysis, H.R. 0155C, at 1 (Apr. 7, 2011) (ECF No. 20-3); Fla. Judiciary Comm., H.R. Staff Analysis, H.R. 0155E, at 1 (Apr. 12, 2011) (ECF No. 20-4).  The House of Representatives' Staff Analysis notes that "Florida law does not contain any provision that prohibits physicians or other medical staff from asking a patient whether he or she owns a firearm or whether there is a firearm in the patient's home."  Fla H.R. 0155C, at 2; Fla H.R. 0155E, at 2.  This law was presumably a means to rectify this perceived gap in Florida laws.

The legislative debates on this bill reveal that the legislature relied heavily on anecdotal information about physicians asking patients about firearm ownership, physicians misrepresenting that Medicaid would not pay out claims if the patient did not answer questions regarding firearms, or physicians refusing to conduct examinations on patients who refused to answer questions about firearm ownership.  It does not appear that the Florida legislature relied on any studies, research, or statistics on physicians' practices or patients' experiences on this issue.

In this litigation, the State has clarified that the Firearm Owners' Privacy Law "is directed at prohibiting the forced disclosure of firearm ownership by patients during the course of the provision

---

[1] The law also contains provisions governing emergency medical technicians or paramedics and insurance companies, and provides that a patient may refuse to answer questions regarding firearms.  *See* § 790.338(3), (4), (7).  These provisions are not subject to the Plaintiffs' challenge in this action.  See Compl. ¶¶ 58-62, setting forth the challenged provisions of the law.

of medical care, as well as the prevention of harassment and discrimination by health care providers against patients based on their ownership of firearms."  Defs.' Resp. 1.  The State maintains that the "primary constitutional right at issue in this litigation" is the right to "keep arms."  *Id*. at 2. According to the State, "the sole focus of the act is the protection of patients who own firearms from the compelled disclosure of the fact they are exercising the constitutional right to possess (i.e., keep) firearms."  *Id*. at 4-5.

The State contends that the law does not prevent physicians from conveying information about firearm safety.  Under the State's reading of the law, a physician may provide firearm safety information to every patient, either orally or through written materials, even when she does not believe it is relevant, as long as she does not ask the patient any questions about firearm ownership or possession.  The State presumably does not believe that providing such unsolicited information would be "unnecessarily harassing" under § 790.338(6).  A physician may ask whether the patient owns or possesses a firearm when she in good faith believes that it is relevant to the patient's safety, or the safety of others.

Further, according to the State's interpretation of the law, the inquiry restriction provision constitutes nothing more than a recommended course of conduct for practitioners.  According to the State, compliance with this provision is merely hortatory; it is not a requirement.  *See* Hearing Tr. 29:5-9 ("[The law] recommends to practitioners that they refrain from asking about firearm ownership in most cases, but it does not prohibit it."); *cf.* Defs.' Supp. Resp. 3 ("Allegations that a physician merely made an inquiry regarding firearm ownership or had a discussion about firearm safety would be legally insufficient [for a complaint before the Department of Health] because neither act is prohibited under the law.").  However, §§ 790.338(8) and 456.072(1)(mm) provide that a violation of the inquiry restriction provision constitutes grounds for disciplinary action against the practitioner.

The State also clarifies that, although the anti-discrimination provision prohibits physicians from discriminating against a patient solely based on firearm ownership, it does not alter existing law that allows a physician to terminate the doctor-patient relationship. *See* Hearing Tr. 29:24-31:6. According to the State, a physician may still terminate the doctor-patient relationship after the patient declines to answer a question about firearm ownership.[2] *See* Hearing Tr. 30:22-25 ("[T]he legislature decided that they didn't want to interfere with the rights of the physicians to terminate the relationship with the patients if there was a refusal to answer."). However, violation of the anti-discrimination provision may constitute grounds for disciplinary action under § 456.072(l)(mm).

**B.  Practice of Preventive Medicine**

Plaintiffs provide evidence that, as part of the practice of preventive medicine, practitioners routinely ask and counsel patients about a number of potential health and safety risks, including household chemicals, swimming pools, drugs, alcohol, tobacco, and firearms. Some practitioners use patient and parent screening questionnaires for new patients or patients scheduled for annual check-ups, in which they ask about a variety of health and safety risks, including access to firearms. *See, e.g.*, Schaechter Decl. ¶ 9; Wollschlaeger Decl. ¶¶ 6-7. Some physicians also orally inquire about risks, including firearms, during other types of patient visits. *See, e.g.*, Schaechter Decl. ¶ 10; Schechtman Decl. ¶ 7.

The American Academy of Pediatrics ("AAP") and its Florida chapter ("FAAP"), as well as the American Academy of Family Physicians ("AAFP") and its Florida chapter ("FAFP"), publish practice guidelines and policy statements that recommend that physicians provide counseling and anticipatory guidance on the prevention of injuries. Cosgrove Decl. ¶ 10; Raspa Decl. ¶¶ 7-8. Part of such counseling and guidance involves counseling patients and families on matters including diet, second-hand smoke, alcohol abuse, household chemicals, use of swimming pools, use of

---

[2] Interestingly, this was precisely the factual scenario that provided the impetus for the legislature to pass this law.

bicycle helmets, automotive safety, and firearms safety.  Cosgrove Decl. ¶ 14; Raspa Decl. ¶ 9.

Similarly, the American College of Physicians ("ACP") and its Florida chapter ("FACP") advance

the position that a physician has a "critical role" in providing preventive injury counseling on diet,

exercise, substance abuse, domestic violence, risky recreational activities, use of swimming pools

and smoke detectors, and firearms safety.  Himmelstein Decl. ¶ 8.

On June 24, 2011, Plaintiffs, physicians and physician interest groups, filed a First Amended

Complaint alleging that the Firearm Owners' Privacy Act violates the First and Fourteenth

Amendments of the U.S. Constitution.  (ECF No. 15).  Plaintiffs seek a preliminary injunction

enjoining enforcement of the law.

## II. LEGAL STANDARD

To obtain a preliminary injunction, a movant must establish (1) it has a substantial

likelihood of success on the merits of its claim, (2) it will suffer irreparable injury unless the

injunction is issued, (3) the threatened injury to it outweighs the possible injury that the injunction

may cause the Defendant, and (4) if issued, the injunction would not disserve the public interest.  *N.

Am. Med. Corp. v. Axiom Worldwide, Inc.*, 522 F.3d 1211, 1217 (11th Cir. 2008).

## III. ANALYSIS

At issue in this litigation is a law directed at maintaining patients' privacy rights regarding

firearm ownership within the context of the doctor-patient relationship.  In effect, however, the law

curtails practitioners' ability to inquire about whether patients own firearms and burdens their

ability to deliver a firearm safety message to patients, under certain circumstances.  The Firearm

Owners' Privacy Act thus implicates practitioners' First Amendment rights of free speech.  The Act

also implicates patients' freedom to receive information about firearm safety, which the First

Amendment protects.  *See Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425

U.S. 748, 756-57 (1976); *Stanley v. Georgia*, 394 U.S. 557, 564 (1969).

5

"The First Amendment presupposes that the freedom to speak one's mind is not only an aspect of individual liberty—and thus a good unto itself—but also is essential to the common quest for truth and the vitality of society as a whole." *Bose Corp. v. Consumers Union of United States, Inc.*, 466 U.S. 485, 503-04 (1984).  This case concerns one of our Constitution's most precious rights—the freedom of speech.  "Open speech by a private citizen on a matter of public importance lies at the heart of expression subject to protection by the First Amendment." *Garcetti v. Ceballos*, 547 U.S. 410, 428 (2006).

Courts have also emphasized the importance of the free flow of truthful, non-misleading information within the doctor-patient relationship.  *See Trammel v. United States*, 445 U.S. 40, 51 (1980) ("[T]he physician must know all that a patient can articulate in order to identify and to treat disease; barriers to full disclosure would impair diagnosis and treatment."); *Conant v. Walters*, 309 F.3d 629, 636 (9th Cir. 2002) ("An integral component of the practice of medicine is the communication between a doctor and a patient.  Physicians must be able to speak frankly and openly to patients."); *see also Sorrell v. IMS Health Inc.*, 131 S. Ct. 2653, 2664 (2011) ("A consumer's concern for the free flow of commercial speech often may be far keener than his concern for urgent political dialogue. . . . That reality has great relevance in the fields of medicine and public health, where information can save lives.").

The State has attempted to inveigle this Court to cast this matter as a Second Amendment case.  Despite the State's insistence that the right to "keep arms" is the primary constitutional right at issue in this litigation, a plain reading of the statute reveals that this law in no way affects such rights.  The right to keep arms refers to the right to "retain," "to have in custody," and "to hold" weapons, including firearms.  *See District of Columbia v. Heller*, 554 U.S. 570, 582-83 (2008) ("'keep arms' was simply a common way of referring to possessing arms").  A practitioner who counsels a patient on firearm safety, even when entirely irrelevant to medical care or safety, does

not affect nor interfere with the patient's right to continue to own, possess, or use firearms.  *Cf.*

*Heller*, 554 U.S. at 628-29 (law that creates blanket ban on firearm possession and use violates

Second Amendment).  The Act—directed at ensuring patients' privacy rights concerning firearm

ownership—does not implicate rights that the Second Amendment protects.  Therefore, I find it

unnecessary to address any of the Defendants' arguments with respect to patients' rights to keep

arms.

**A.  <u>Standing</u>**

Plaintiffs bear the burden of establishing standing.  *Lujan v. Defenders of Wildlife*, 504 U.S.

555, 561 (1992).  To establish standing, a plaintiff must satisfy three elements:  (i) an injury-in-fact,

i.e., an invasion of a legally protected interest that is concrete and particularized, and actual or

imminent; (ii) causation, i.e., a causal connection between the injury and the conduct complained

of; and (iii) redressability, i.e., it must be likely that a favorable decision will redress the injury.  *Id.*

at 560-61.  Plaintiffs meet these elements, and have standing to challenge the Firearm Owners'

Privacy Act.

Plaintiffs have established an injury-in-fact.  An injury-in-fact is a concrete and

particularized injury that is actual or imminent, not conjectural or hypothetical.  *Lujan*, 504 U.S. at

560.  A particularized injury affects the plaintiff "in a personal and individual way."  *Id.* at 560 n.1.

"[I]t is well-established that an actual injury can exist when the plaintiff is chilled from exercising

her right to free expression or forgoes expression in order to avoid enforcement consequences.  In

such an instance, the injury is self-censorship."  *Harrell v. The Florida Bar*, 608 F.3d 1241, 1254

(11th Cir. 2010).

The law personally affects Plaintiffs because they are currently engaging in self-censorship

to avoid potential disciplinary action.  This injury is actual.  Plaintiffs have provided evidence that

they and other physicians began self-censoring themselves shortly after the law went into effect.

Plaintiffs state that, as a result of the law, they are no longer (i) asking patients about firearm ownership, (ii) following-up on routine questions regarding firearm ownership, (iii) providing patient intake questionnaires that include questions about firearms, or (iv) orally counseling patients about firearm safety.  *See, e.g.*, Schaechter Decl. ¶ 17; Schechtman ¶ 15; Fox-Levine Decl. ¶¶ 10-11; Goodman Decl. ¶ 10.

Although the State interprets several of the Firearm Owners' Privacy Act's provisions as hortatory in nature, the law provides for penalties in the form of disciplinary action when a practitioner violates any provision of § 790.338.  *See* § 790.338(8); 456.072(1)(mm).  On June 2, 2011, the Florida Board of Medicine determined that a violation of this law "would be a failure to comply with a legal obligation and current disciplinary guidelines would apply."[3]  Fla. Bd. of Medicine, Rules and Legislative Comm. Meeting, Meeting Rep., at 3:32-33 (Jun. 2, 2011) (ECF No. 20-5).

Generally, laws that provide for disciplinary action in the case of violations or non-compliance are mandatory, not precatory or hortatory, as the State argues.  *Compare Liesegang v. Sec'y of Veterans Affairs*, 312 F.3d 1368, 1377 (Fed. Cir. 2002) ("In the absence of any consequences for noncompliance, [a law's] timing provisions are at best precatory rather than mandatory."), *with Kittay v. Kornstein*, 230 F.3d 531, 538 n.3 (2d Cir. 2000) (noting that attorney disciplinary rules are mandatory, as they "state the minimum level of conduct below which no lawyer can fall without being subject to disciplinary action"), *and Edwards v. Born, Inc.*, 792 F.2d 387, 392 n.1 (3d Cir. 1986) (same).

---

[3] I note, however, that the Florida Board of Medicine has provided conflicting advice to health care practitioners regarding the law.  On June 14, 2011, the Board sent a letter to practitioners stating that the law "prohibited [practitioners] from inquiring about the ownership of firearms or ammunition unless the information is relevant . . .."  On July 18, 2011, the Board amended its statement, clarifying that "the law does not *prohibit* the asking of such questions, but rather *recommends* that [practitioners] *should* refrain from asking them." (emphasis in original).  The State has clarified that the letters do not constitute a policy statement and do not bind the Board in any way.  Thus, although the parties have argued at length over these letters, I find that they have little, if any, significance here.

Further, the law's use of the word "should" instead of "shall" is not dispositive of the issue. The word "should" can impose a mandatory rule of conduct.[4]  *See, e.g.*, *United States v. Anderson*, 798 F.2d 919, 924 (7th Cir. 1986) ("[T]he word 'should' is defined as 'the past tense of shall,' (*Webster's New World Dictionary* at 1349 (1962)) and as listed in *Roget's Thesaurus* means 'be obliged, must . . . have to.'  The common interpretation of the word 'should' is 'shall.'").  Finally, the State's interpretation of the law as hortatory would render meaningless the law's provision that violations of the law shall constitute grounds for disciplinary action.  *See Myers v. TooJay's Mgmt. Corp.*, 640 F.3d 1278, 1285 (11th Cir. 2011) ("[A] statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant." (quoting *Corley v. United States*, 556 U.S. 303 (2009))).

The evidence on the record shows that, for a physician, being called before the Board of Medicine, even on an unfounded complaint, may result in harm to the physician's reputation and professional standing in the community.  *See, e.g.*, Schechtman Decl. ¶ 22; Wollschlaeger Decl. ¶ 11; Fox-Levine Decl. ¶ 18; Goodman Decl. ¶ 12.  To avoid possible disciplinary actions, physicians are engaging in self-censorship, as described above.  If a physician were to use an intake questionnaire including a question about firearms or orally ask questions that a patient may find unnecessarily harassing, there is an objective threat of specific future harm, i.e., disciplinary action. *See Laird v. Tatum*, 408 U.S. 1, 13-14 (1972).

Finally, nothing in the record indicates that the State does not intend to enforce the law if a patient files a complaint.  The Eleventh Circuit has clarified that "[i]f a challenged law or rule was

---

[4] The National Rifle Association ("NRA") argues that a law that employs the word "should" is precatory rather than mandatory, "and therefore cannot be the basis for imposing disciplinary sanctions."  NRA Br. 3 (quoting *United States v. Robinson*, 922 F.2d 1531, 1534 (11th Cir. 1991)).  The basis for imposing sanctions for violations of the law does not come from the language in § 790.338(1)-(7), but from the language in § 790.338(8) and § 456.072(1)(mm), which expressly provide that violations of § 790.338 shall constitute grounds for disciplinary action.  This Court cannot construe the Firearm Owners' Privacy Act as hortatory without entirely disregarding these express legislative directives.

recently enacted, or if the enforcing authority is defending the challenged law or rule in court, an intent to enforce the rule may be inferred." *Harrell*, 608 F.3d at 1257.  The legislature enacted the law about four months ago, and the State is defending it in this litigation.  This Court may therefore infer that the State intends to enforce the rule.

Plaintiffs also meet the causation and redressability requirements for standing.  The evidence on the record establishes that Plaintiffs began self-censoring because the law went into effect in June 2011.  Passage of the law caused Plaintiffs' injury by chilling their speech.  A favorable decision in this litigation in the form of a declaration that the law is unconstitutional will redress the Plaintiffs' injury.  Plaintiffs would then be free to resume use of questionnaires including questions about firearm ownership and counseling patients regarding firearm safety.

Having determined that Plaintiffs have standing to challenge the law, I now turn to the factors for determining whether a preliminary injunction is warranted.  Plaintiffs seek to enjoin the law on three theories:  (i) the law is unconstitutional on its face; (ii) it is void for vagueness; and (iii) the law is overbroad.  Because I find that Plaintiffs are likely to succeed on their facial challenge to the law, I need not reach their other constitutional challenges.

## B. <u>Likelihood of Success on the Merits</u>

### 1.  Facial Challenge

#### a.  *Strict Scrutiny Applies*

"The First Amendment generally prevents government from proscribing speech . . . because of disapproval of the ideas expressed." *R.A.V. v. City of St. Paul*, 505 U.S. 377, 382 (1992).  A content-based statute by its terms distinguishes favored speech from disfavored speech based on the ideas or views expressed. *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 643 (1994).  "Regulation of the subject matter of messages, . . . is . . . an objectionable form of content-based regulation." *Hill v. Colorado*, 530 U.S. 703, 723 (2000).  A content-neutral statute, on the other hand, "places no

restrictions on . . . either a particular viewpoint or any subject matter that may be discussed." *Id.*

Content-based statutes that ban or burden constitutionally protected speech are subject to strict scrutiny, i.e., "it is constitutional only if it constitutes the least restrictive means of advancing a compelling government interest." *Solantic, LLC v. City of Neptune Beach*, 410 F.3d 1250, 1258 (11th Cir. 2005); *see Sorrell*, 131 S. Ct. at 2664 ("[T]he distinction between laws burdening and laws banning speech is but a matter of degree and . . . the Government's content-based burdens must satisfy the same rigorous scrutiny as its content-based bans." (internal quotations omitted)). "It is rare that a regulation restricting speech because of its content will ever be permissible." *United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 818 (2000).  Content-based statutes, therefore, "are presumptively invalid." *R.A.V.*, 505 U.S. at 382.

On its face, the Firearms Owners' Privacy Act places restrictions on a practitioner's freedom to inquire about or discuss a particular subject matter.  The law bans inquiries regarding firearms unless the practitioner has a good faith belief that the information is relevant to the medical care or safety of the patient or others.  Under the law, practitioners may not record such information in the patient's medical record unless she knows the information is relevant.  Under this law, for example, physicians may ask a new patient complaining of a stomachache to fill out an initial intake questionnaire that includes questions regarding household chemicals, risky recreational activities, sexual conduct, or drugs and alcohol kept in the home, but not whether the patient owns a firearm. Additionally, although the law does not prevent practitioners from providing unsolicited information regarding firearm safety to any patient, the law arguably burdens practitioners' speech.[5] Physicians concerned that a patient may interpret unsolicited counseling as "unnecessarily

---

[5] This Court has reviewed the numerous affidavits of physicians and *amici* regarding the practice of inquiring about firearm ownership.  Although it is unclear how widespread this practice may be, the State may not impede, as it has done through this law, the practice of preventive medicine by restricting practitioners' ability to inquire about firearm ownership.

harassing" have stopped or curtailed their practice of counseling patients on firearm safety.

Review of legislative history reinforces the conclusion that the law places restrictions on a particular subject matter.[6] The "current situation" that the State legislature intended to change through this law's passage was practitioners' practice of asking about firearm ownership:

> In recent months, there has been media attention surrounding an incident in Ocala, Florida, where, during a routine doctor's visit, a pediatrician asked a patient's mother whether there were firearms in the home. When the mother refused to answer, the doctor advised her that she had 30 days to find a new pediatrician. The doctor stated that he asked all of his patients the same question in an effort to provide safety advice in the event there was a firearm in the home. He further stated that he asked similar questions about whether there was a pool at the home, and whether teenage drivers use their cell phone while driving for similar reasons – to give safety advice to patients. The mother, however, felt that the question invaded her privacy. This incident has led many to question whether it should be an accepted practice for a doctor to inquire about a patient's firearm ownership.
> Various professional medical groups have adopted policies that encourage or recommend that physicians ask patients about the presence of a firearm in the home. For example, the American Medical Association (AMA) encourages its members to inquire as to the presence of household firearms as a part of childproofing the home and to educate patients to the dangers of firearms to children. Additionally, the American Academy of Pediatrics recommends that pediatricians incorporate questions about guns into their taking of patient history.

State of Florida, Final Bill Analysis, CS/CS/HB 155, at 2 (ECF No. 49-1). The Florida legislature specifically identified policies encouraging and recommending that physicians ask about firearms as an aspect of the problem that the law would rectify. The title of the bill—"An Act relating to the privacy of firearm owners"—and the title of § 790.338--"Medical privacy concerning firearms"— both suggest that the focus of the law is directed at only one subject matter—firearm ownership.

Statements by certain members of the Florida legislature similarly evidence concern or disagreement with health practitioners' firearm safety message. *See, e.g.*, State of Florida, H.R.

---

[6] A court may look to a law's legislative history to assist in determining whether it discriminates against a particular viewpoint. *See, e.g.*, *Sorrell*, 131 S. Ct. at 2663 ("Any doubt that § 4631(d) imposes an aimed, content-based burden on detailers is dispelled by the record and by formal legislative findings."); *Denver Area Educ. Telecomm. Consortium, Inc. v. FCC*, 518 U.S. 727, 766 (1996) (concluding provision violated First Amendment after "[h]aving carefully reviewed the legislative history of the Act, the proceedings before the FCC, the record below, and the submissions of the parties and *amici*").

Debate, 2011 Sess. (Apr. 26, 2011) (remarks of Rep. Frank Artiles) ("This is purely a political--a political--and an attack on the constitutional right to own a possessive firearm disguised as a safety concern, and that is a problem. . . . People are not reporting it, but it's happening, and that's why I support this bill.").  The Florida legislature also heard testimony from the NRA, which stated, "Every single day in Florida physicians are violating patients' privacy rights and people are furious. Questioning patients about gun ownership to satisfy a political agenda and withholding medical care when patients are most vulnerable needs to stop."  Hearing on HB 155 Before the Criminal Justice Subcomm. (Mar. 8, 2011) (testimony of Marion Hammer).

The plain language of the law, with reference to its legislative history, leads me to conclude that the Firearms Owners' Privacy Act is content-based.  Having so determined, I must analyze whether the law will likely survive strict scrutiny.  *See Sorrell*, 131 S. Ct. at 2664; *Solantic*, 410 F.3d at 1267.

The State argues that strict scrutiny does not apply.  It contends that the law merely regulates "professional speech," which does not implicate constitutionally protected speech under the First Amendment.  *See Locke v. Shore*, 634 F.3d 1185, 1191 (11th Cir. 2011).  "A statute that governs the practice of an occupation is not unconstitutional as an abridgement of the right to free speech, so long as any inhibition of that right is merely the incidental effect of observing an otherwise legitimate regulation."  *Id*.

Indeed, the First Amendment does not prevent restrictions directed at regulating professional speech or occupational conduct that impose mere incidental burdens on speech.  Thus, a law may require physicians to provide information about the risks of abortion and childbirth, *Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833, 884 (1992)[7]; a law may prohibit

_____

[7] The plurality decision in *Casey* is distinguishable on its facts.  *Casey* implicated physical autonomy rights that are not at issue here.  The Supreme Court made clear that the "[w]hatever constitutional status the doctor-patient relation may have as a general matter, *in the present context* it is derivative of the woman's

unlicensed designers from using the name or title "interior designer," *Locke*, 634 F.3d at 1190-91;

or a rule may prohibit suspended or disbarred attorneys from having substantial client contact,

*Wilson v. State Bar of Georgia*, 132 F.3d 1422, 1429-30 (11th Cir. 1998).  Laws on professional

speech or occupational conduct, however, are generally directed at regulating the access or practice

of a profession, not at burdening or censoring private, constitutionally protected speech on a

particular subject matter.  *Cf. Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 547-49 (2001)

(invalidating provision that prevented attorneys receiving federal funds from challenging existing

welfare laws); *Thomas v. Collins*, 323 U.S. 516, 544 (1945) (Jackson, J., concurring) ("[T]he state

may prohibit the pursuit of medicine as an occupation without its license, but I do not think it could

make it a crime publicly or privately to speak urging persons to follow or reject any school of

medical thought.").

   The Supreme Court's recent decision in *Sorrell* is instructive to determine what constitutes

an "incidental burden" on speech.  The law before the Court in *Sorrell* restricted the sale, disclosure,

and use of pharmacy records on physicians' prescribing practices for marketing purposes.  131 S.

Ct. at 2662-63.  The State justified the law as a means to protect medical privacy—including

physician confidentiality, avoidance of harassment, and ensuring the integrity of the doctor-patient

relationship—and to improve public health and reduce health care costs.  *Id*. at 2668.  The Court

held that none of these justifications withstood scrutiny.  *Id*.  The Court held that the law had the

effect of preventing so-called pharmaceutical "detailers" from communicating with physicians in an

effective and informative manner regarding their prescriptions.  *Id*. at 2663.  Because the law

imposed a burden based on the content of speech and the identity of the speaker, it had more than an

---

position." *Casey*, 505 U.S. at 884 (emphasis added).  The present case does not implicate competing
constitutional rights similar to those in *Casey*.  *Casey* stands for the limited proposition that a state
may require a health practitioner to provide specified truthful, non-misleading information to a woman prior to
obtaining her consent to an abortion.  *Id*.  *Casey* does not stand for the proposition that, as here, the
government may prevent a practitioner from providing specified truthful, non-misleading information to a
patient.

incidental effect on protected expression and warranted heightened judicial scrutiny. *Id*. at 2664-65.

By regulating the circumstances in which a practitioner may inquire or record information about firearm ownership, the Firearm Owners' Privacy Act imposes restrictions based on the content of practitioners' speech with regard to only one particular subject matter. The law has more than an incidental effect on protected expression; rather, the law directly targets protected expression by restricting it. Heightened judicial scrutiny therefore applies.

> **b. *The law does not constitute the least restrictive means to advance a compelling government interest***

"[T]he burdens at the preliminary injunction stage track the burdens at trial." *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 429 (2006). Thus, a court may grant a preliminary injunction where the government fails to show a likelihood of success on the merits under the compelling interest test. *Id*.; *Ashcroft v. Am. Civil Liberties Union*, 542 U.S. 656, 666 (2004) ("As the Government bears the burden of proof on the ultimate question of [the law's] constitutionality, the [Plaintiffs] must be deemed likely to prevail unless the Government has shown that [Plaintiffs'] proposed less restrictive alternative are less effective than [enforcing the law]."). The recordkeeping, inquiry restriction, anti-harassment, and anti-discrimination provisions in § 790.338 do not withstand strict scrutiny.

To survive strict scrutiny, a law must constitute the least restrictive means of advancing a compelling government interest. *Solantic,* 410 F.3d at 1258. A court's determination of whether an interest is compelling, "is not to be made in the abstract, by asking whether fairness, privacy, etc., are highly significant values; but rather by asking whether the *aspect* of fairness, privacy, etc., addressed by the law at issue is highly significant." *Cal. Democratic Party v. Jones*, 530 U.S. 567, 584 (2000).

The State's asserted justification for the Firearm Owners' Privacy Act is to prohibit practitioners from forcing patients to disclose information about firearm ownership during the

course of the provision of medical care, as well as to prevent health practitioners from harassing and

discriminating against patients based on their ownership of firearms.  The State does not cite any

case law to support the proposition that protecting patients from inquiries regarding firearm

ownership constitutes a compelling government interest.  In fact, "[w]here the designed benefit of a

content-based speech restriction is to shield the sensibilities of listeners, the general rule is that the

right of expression prevails, even where no less restrictive alternative exists."  *Playboy Entm't Grp.*,

529 U.S. at 813.

The State's interest in assuring the privacy of this piece of information from practitioners

does not appear to be a compelling one.  Information regarding firearm ownership is not sacrosanct;

federal and state statutes heavily regulate firearm ownership, possession, and sale, and require

firearm owners to provide personal information in certain circumstances as a condition for obtaining

a firearm or certain licenses.  *See, e.g.*, Fla Stat. Ch. 790; 18 U.S.C. § 922; *cf. Jones*, 530 U.S. at 585

(holding government's stated interest in protecting privacy of voter affiliation information was not

compelling, and noting that such information was not sacrosanct, as evidenced by federal statutes

requiring declaration of party affiliation as a condition of appointment to certain offices).  For

example, to purchase a firearm, Florida residents must provide personal information and

identification and subject themselves to a criminal background check.  Fla. Stat. § 790.065.  To

carry a concealed firearm in Florida, a person must obtain a license.  Fla. Stats. §§ 790.01, 790.06.

The State also provides no case law indicating that preventing practitioners from harassing

or discriminating against a patient based on firearm ownership constitutes a compelling government

interest.  The State also fails to provide any specific evidence, beyond anecdotal information, that

such "harassment" and "discrimination" is widespread or pervasive.  It is unlikely that a concern for

some patients who may be offended or uncomfortable by questions regarding firearm ownership

could justify this law.  *See Sorrell*, 131 S. Ct. at 2669 ("'Some doctors in Vermont are experiencing

an undesired increase in the aggressiveness of pharmaceutical sales representatives,' the Vermont Legislature found, 'and a few have reported that they felt coerced and harassed.' . . . It is doubtful that concern for 'a few' physicians who may have 'felt coerced and harassed' by pharmaceutical marketers can sustain a broad content-based rule like § 4631(d)."). "Many are those who must endure speech they do not like, but that is a necessary cost of freedom." *Id.*

Additionally, the State's interest in preventing discrimination is dubious, as the State itself acknowledges that the law does not prevent a physician from terminating the doctor-patient relationship if a patient refuses to answer questions regarding firearm ownership. The anti-discrimination provision therefore provides only remote, if any, support for the State's asserted purpose. *See FCC v. League of Women Voters of Cal.*, 468 U.S. 364, 396 (1984) (finding the substantiality of the government's asserted interest "dubious" where the law at issue provided "only ineffective or remote support for the government's purpose").

Even assuming, however, that the State's asserted interests are compelling, the law likely cannot withstand strict scrutiny because it is not the least restrictive means to accomplish that end. In the case of a facially content-based statute such as the one here, the statute must be "*necessary* to serve the asserted compelling interest." *R.A.V.*, 505 U.S. at 395 (emphasis in original) (internal quotation marks omitted). "The existence of adequate content-neutral alternatives . . . undercuts significantly any defense of such a statute." *Id.* In considering whether a least restrictive alternative exists,

> a court assumes that certain protected speech may be regulated, and then asks what is the least restrictive alternative that can be used to achieve that goal. The purpose of the test is not to consider whether the challenged restriction has some effect in achieving Congress' goal, regardless of the restriction it imposes. The purpose of the test is to ensure that speech is restricted no further than necessary to achieve the goal, for it is important to ensure that legitimate speech is not chilled or punished. For that reason, the test does not begin with the status quo of existing regulations, then ask whether the challenged restriction has some additional ability to achieve Congress' legitimate interest. Any restriction on speech could be justified under that analysis. Instead, the court should ask

17

whether the challenged regulation is the least restrictive means among available, effective alternatives.

*Ashcroft*, 542 U.S. at 666.  The Plaintiffs are deemed likely to prevail unless the State shows that Plaintiffs' proposed least restrictive alterative is less effective than enforcing the Firearm Owners' Privacy Act.  *Id*.

Plaintiffs contend that a least restrictive alternative to the recordkeeping and inquiry restriction provisions would be a law permitting patients to decline to answer any inquiries regarding firearm ownership.  Plaintiffs' proposed alternative would also prohibit a practitioner from entering any information regarding firearm ownership into the medical records of a patient who declined to provide such information.

The State does not provide any argument or evidence to suggest that Plaintiffs' proposed least restrictive alternative would be less effective in protecting patients from forced disclosure of information regarding firearm ownership.  Section 790.338(4) already provides that a patient may decline to answer questions about firearm ownership.  This provision likely provides an effective means to protect patients' privacy.  Placing the decision-making authority in the hands of the patient is likely to be a less restrictive alternative to prohibiting practitioners' speech.  *Cf., e.g.*, *Sorrell*, 131 S. Ct. at 2669-70 (noting that physicians could protect their privacy by declining to meet with detailers or give "no solicitation" or "no detailing" instructions to their office managers or receptionists); *Watchtower Bible & Tract Soc'y of N.Y., Inc. v. Village of Stratton*, 536 U.S. 150, 168 (2002) ("With respect to [protecting residents' privacy], it seems clear that . . . the ordinance, which provides for the posting of 'No Solicitation' signs and which is not challenged in this case, coupled with the resident's unquestioned right to refuse to engage in conversation with unwelcome visitors, provides ample protection for the unwilling listener."); *Village of Schaumburg v. Citizens for a Better Env't*, 444 U.S. 620, 639 (1980) ("[T]he provision permitting homeowners to bar solicitors from their property by posting signs reading 'No Solicitors or Peddlers Invited,' . . .

18

suggest the availability of less intrusive and more effective measures to protect privacy.").

Further, the State does not explain why existing laws are insufficient to achieve the government's asserted interests in protecting patient privacy.  State and federal laws protect as confidential patients' medical records.  *See, e.g.*, Health Ins. Portability and Accountability Act of 1996, 42 U.S.C. § 1320d, *et seq.*; Fla. Stat. § 456.057.

As to the anti-harassment and anti-discrimination provisions, Plaintiffs contend that a least restrictive alternative would be a law that targets only offensive behavior or the manner of delivery of speech without regard to subject matter.  A law not limited to a particular subject matter would have the same beneficial effect as the State hopes to achieve with the anti-harassment and anti-discrimination provisions.  The State does not provide any argument or evidence to suggest that Plaintiffs' proposed alternative would be less effective in protecting patients from harassment or discrimination.

In *R.A.V. v. St. Paul*, the Supreme Court struck down an ordinance that prohibited "fighting words" that insulted or provoked violence on the basis of race, color, creed, religion, or gender.  505 U.S. at 391.  The Court noted that, through this ordinance, the city had not "singled out an especially offensive mode of expression," such as fighting words that communicate ideas in a threatening manner; rather, it "proscribed fighting words of whatever manner that communicate messages of racial, gender, or religious intolerance."  *Id.* at 393-94.

Here, the State has proscribed harassment and discrimination with respect to the subject of firearm ownership only.  For example, a practitioner would remain in compliance with § 790.338 if she harassed or discriminated against a patient because of her use of alcohol or tobacco, or her sexual behavior.  The State has singled out only harassing or discriminating words and conduct that communicate messages regarding firearm safety.  In *R.A.V.*, the Court made clear that "[s]electivity of this sort creates the possibility that the city is seeking to handicap the expression of particular

ideas." *Id*. at 394.  However, "[w]here the government does not target conduct on the basis of its expressive content, acts are not shielded from regulation merely because they express a discriminatory idea or philosophy." *Id*. at 389-90 (noting that sexually derogatory words may violate Title VII's general prohibition against sexual discrimination in the workplace).  Thus, a less restrictive alternative would be a law proscribing harassment and discrimination in a content-neutral manner.

I will not speak to the wisdom of the legislation now before me.  Questions of a law's constitutionality do not create "a license for courts to judge the wisdom, fairness, or logic of legislative choices." *FCC v. Beach Commc'ns, Inc*., 508 U.S. 307, 313 (1993).  The First Amendment, however, "was not designed to facilitate legislation," whether wise or not. *FEC v. Wis. Right to Life, Inc*., 551 U.S. 449, 503 (2007) (Scalia, J., concurring).  Based on the foregoing, I find that Plaintiffs have a substantial likelihood of succeeding on the merits of their constitutional challenge.

## C.  <u>Irreparable Injury</u>

"It is well established that 'the loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.'" *KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261, 1271-72 (11th Cir. 2006) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)) (internal quotation marks omitted).  Because of the "intangible nature" of chilled free speech, a plaintiff cannot be compensated or made whole by monetary damages. *Id*. at 1272 (quoting *Ne. Fla. Chapter of the Ass'n of Gen. Contractors v. Jacksonville*, 896 F.2d 1283, 1285 (11th Cir. 1990)).

Plaintiffs are likely to succeed on the merits of their facial challenge to the Firearm Owners' Privacy Act.  The evidence on the record shows that practitioners have eliminated questions about firearm ownership from intake questionnaires and either curtailed or stopped routine counseling on firearm safety as a result of this law.  Practitioners are self-censoring themselves out of fear of

disciplinary actions.  Plaintiffs' injury is their chilled free speech.  Such an injury is of a nature that an award of monetary damages cannot remedy.  *KH Outdoor*, 458 F.3d at 1272.  This factor therefore weighs in favor of an injunction.

**D.  Balance of Hardships**

The threatened injury to Plaintiffs outweighs whatever damage the injunction may cause the State.  The State "has no legitimate interest in enforcing an unconstitutional [law]."  *KH Outdoor*, 458 F.3d at 1272.  This factor weighs in Plaintiffs' favor.

**E.  Public Interest**

An injunction would not be adverse to the public interest.  "The public has no legitimate interest in enforcing an unconstitutional [law]."  *KH Outdoor*, 458 F.3d at 1272; *Fla. Businessmen for Free Enter. v. City of Hollywood*, 648 F.2d 956, 959 (5th Cir. 1981) ("The public interest does not support the city's expenditure of time, money, and effort in attempting to enforce an ordinance that may well be held unconstitutional.").  This factor weighs in Plaintiffs' favor.

## IV.  CONCLUSION

Each of the factors for a preliminary injunction weighs in Plaintiffs' favor.  For that reason, the Plaintiffs' Motion for Preliminary Injunction (ECF No. 16) is **GRANTED**.  The State is preliminarily enjoined from enforcing § 790.338(1), (2), (5), and (6).[8]  The State is also preliminarily enjoined from enforcing § 790.338(8), to the extent that it provides that violations of § 790.338(1) and (2) constitute grounds for disciplinary action.  The State is further preliminarily enjoined from enforcing § 456.072(1)(mm), to the extent that it provides that violations of § 790.338(1), (2), (5), and (6) shall constitute grounds for which disciplinary actions specified under

---

[8] Plaintiffs' proposed order would enjoin Defendants from enforcing any part of the law.  "A preliminary injunction should be narrowly tailored to remedy the specific harm alleged."  *United States v. BNS Inc*., 858 F.2d 456, 464 (9th Cir. 1988).  I will preliminarily enjoin Defendants from enforcing only the parts of the law that Plaintiffs have specifically challenged in their Amended Complaint and in their Motion for Preliminary Injunction.

§ 456.072(2) may be taken.

**DONE and ORDERED** in chambers at Miami, Florida, this 14th day of September 2011.

_Marcia G. Cooke_

MARCIA G. COOKE
United States District Judge

Copies furnished to:
_William C. Turnoff, U.S. Magistrate Judge_
_Counsel of record_