IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO.: 1:11-CV-22026-COOKE/TURNOFF

DR. BERND WOLLSCHLAEGER, *et al.*,

    Plaintiffs,

v.

FRANK FARMER, *et al.*,

    Defendants.

_____/

**JOINT STATEMENT OF UNDISPUTED FACTS
IN SUPPORT OF CROSS MOTIONS FOR SUMMARY JUDGMENT**

    1.    The Legislature passed CS/CS/HB 155, and on June 2, 2011, Governor Rick Scott signed the bill into law. It became chapter 2011-112, Laws of Florida. *See* Chapter 2011-112, Laws of Florida (codified at Fla. Stats. §§ 790.338, 381.026, 456.072, 395.1055) ("Chapter 2011-112").

    2.    Chapter 2011-112's title states that it is "An act related to the privacy of firearms owners." Chapter 2011-112, Fla. Stat. at 1. The chapter creates § 790.338, Fla. Stat., which in turn is titled "Medical privacy concerning firearms; prohibitions; penalties; exceptions."

    3.    CS/CS HB 155 was prompted in part by an incident in Ocala, where "during a routine doctor's visit, a pediatrician asked a patient's mother whether there were firearms in the home. When the mother refused to answer, the doctor advised her that she had 30 days to find a new pediatrician. The doctor stated that he asked all of his patients the same question in an effort to provide safety advice in the event there was a firearm in the home. He further stated that he asked similar questions about whether there was a pool at the home, and whether teenage drivers use their cell phone while driving for similar reasons – to give safety advice to patients.

- 1 -

- 2 -

The mother, however, felt that the question invaded her privacy." *See* Fla. Health & Human Servs. Comm., H.R. Staff Analysis, H.R. 0155C, at 2 (Apr. 7, 2011) (DE 20-3); Fla. Judiciary Comm., H.R. Staff Analysis, H.R. 0155E, at 2 (Apr. 12, 2011) (DE 20-4).

4. The House of Representatives Health & Human Services Committee and Judiciary Committee Staff Analyses for the bill state that the "professional medical groups have adopted policies that encourage or recommend that physicians ask patients about the presence of a firearm in the home. For example, the American Medical Association (AMA) encourages its members to inquire as to the presence of household firearms as a part of childproofing the home and to educate patients to the dangers of firearms to children." The analyses also state that "Florida law does not contain any provision that prohibits physicians or other medical staff from asking a patient whether he or she owns a firearm or whether there is a firearm in the patient's home." Fla. Health & Human Servs. Comm., H.R. Staff Analysis, H.R. 0155C, at 2 (Apr. 7, 2011) (DE 20-3); Fla. Judiciary Comm., H.R. Staff Analysis, H.R. 0155E, at 2 (Apr. 12, 2011) (DE 20-4).

5. During an April 26, 2011 House Floor Debate on HB 155, Representative Artiles said that at a doctor's appointment involving his daughter, he was asked by the pediatrician if he owned a firearm, and he was then asked to remove that gun from the home. He spoke in favor of the bill and stated that the statute was intended to counter what he called "a political . . . attack on the constitutional right to own a possessive firearm." Audio CD: Regular Session House Floor Debate on HB 155, held by the Florida House of Representatives (Apr. 26, 2011) at 26:20 (remarks of Rep. Artiles) ("House Floor Debate") (on file with the Florida House of Representatives Office of the Clerk); Manheim Decl. ¶¶ 9-10 (DE 58-1) (reflecting true and accurate transcript of 26:20).

- 3 -

6. During the House Floor Debate, Representative Brodeur stated that "[a] lot of this [Bill] stems [from] where there's a well-documented case in Ocala in which a physician declined to . . . provide care for a family because they owned a firearm" and that "a family was told that it's a Medicaid necessity . . . to answer a firearms question." Representative Brodeur also stated that he, along with all others at the debate, received an email describing "a mother who was separated from her children while medical personnel not only interrogated the children about gun ownership but put that in their medical record." *Id.* at 13:40 (remarks of Rep. Brodeur); Manheim Decl. ¶¶ 11-12 (DE 58-1) (reflecting true and accurate transcript of 13:40).

7. Also during the House Floor Debate, Representative Baxley stated that "this actually started around an incident in my own hometown, and I had many of my own constituents ask me to rebalance this equation." Audio CD: Regular Session House Floor Debate on HB 155, held by the Florida House of Representatives at 28:15 (April 26, 2011) (remarks of Rep. Baxley); Manheim Decl. ¶¶ 19-20 (DE 58-1) (reflecting true and accurate transcript of 28:15).

8. During an April 27-28, 2011 Senate Floor Debate on HB 155, Senator Evers reported that his constituents called him and told him that there was a problem. He also stated, "a lot's been said that there was folks in Orlando and even farther south, well, mine wasn't from Orlando or farther south, it was from Pace, Florida, the center and heart of my district. . . . That's the reason for the bill." Senator Evers also said that "one of my own personal constituent" called and told him "that a doctor had refused care upon a nine year old . . . that was in their custody . . . because they wanted to know if they had a firearm in their home." Audio CD: Regular Session Senate Floor Debate, held by the Florida Senate (Apr. 27-28, 2011) at 11:44, 26:32 (remarks of

Sen. Evers) ("Senate Floor Debate") (on file with the Florida Senate Office of the Secretary); Manheim Decl. ¶¶ 14-15 (DE 58-1) (reflecting true and accurate transcript of 11:44 & 26:32).

9.   Representative Brodeur, at the April 5, 2011 Health & Human Services Committee Hearing on HB 155, also discussed the Ocala incident and Senator Evers' report that a citizen in his district was told that disclosing firearm ownership was a Medicaid requirement. Fla. Heath & Human Servs. Comm. Hearing (Apr. 5, 2011) (Remarks of Rep. Brodeur) at 37:37 (available at http://www.myfloridahouse.gov/sections/Committees/ committeesdetail.aspx?SessionId=70&CommitteeId=2593); Manheim Decl. ¶¶ 13-16 (DE 58-1) (reflecting true and accurate transcript of 37:37).

10.   At a March 8, 2011 Committee Hearing held by the Criminal Justice Subcommittee, Marion Hammer of the NRA reported: "One family, with a foster child, was told by the pediatrician's office that Medicaid would not pay claims if they didn't answer gun questions." Ms. Hammer reported another incident: "[A] child doesn't get examined when a mother refuses to answer whether they have a gun in their home; the doctor's office sent them a bill, and then sent collectors after them when they refused to pay." She also testified that "One father feared the doctor would retaliate and call social services because the anti-gun doctor thinks the gun in the home creates a dangerous environment for a child." Ms. Hammer further testified that "[q]uestioning patients about gun ownership to satisfy a political agenda . . . needs to stop." Fla. House Crim. Justice Subcomm. Hearing (Mar. 8, 2011) (testimony of Marion Hammer, NRA) at 1:27:55, 1:29:00 (available at http://www.myfloridahouse.gov/sections/Committees/ committeesdetail.aspx?SessionId=70&CommitteeId=2614); Manheim Decl. ¶¶ 17-18 (DE 58-1) (reflecting true and accurate transcript of 1:27:55, 1:29:00).

11. Penalties for violation of statutes and rules related to physician conduct, including Chapter 2011-112, include revocation of licenses to practice medicine, imposition of administrative fines of up to $10,000 per count or offense, return of fees collected, issuance of letters of reprimand, and compulsory remedial medical education. *See* Fla. Stat. §§ 790.338(8), 395.1055, 456.072(1)(mm)–(2), 456.072(2).

12. The minutes of the June 2, 2011, meeting of the Rules/Legislative Committee of the Board of Medicine state: "[Executive Director of the Florida Board of Medicine] Ms. [Joy] Tootle summarized [chapter 2011-112] which creates Section 790.338, F.S., to provide that a health care practitioner or facility shall not ask about firearm ownership or possession unless there is a good faith belief that the information is relevant to a patient's care or safety or the safety of others. The bill also prohibits practitioners from entering firearm ownership information into a patient's medical record unless the information is relevant to patient care or safety, or safety of others. A patient may decline to provide firearm information, and the patient's decision to not answer does not alter existing law regarding a physician's authority to choose his or her patients. A licensee or facility may not discriminate against a patient solely on basis [sic] of ownership or possession of a firearm, and shall not harass a patient about firearm ownership during an exam. Violations of this section are grounds for disciplinary action. The Florida Patient's Bill of Rights was expanded to include right [sic] to privacy for firearm ownership." The minutes also state: "After discussion, the Committee determined violation of this law falls under failure to comply with a legal obligation and the current disciplinary guidelines for this violation would apply." Fla. Bd. of Medicine, Rules and Legislative Comm. Meeting, Meeting Rep., at 3:17-30 (Jun. 2, 2011) (DE 20-5).

13. On June 14, 2011, Joy A. Tootle, Executive Director of the Florida Board of Medicine, mailed a letter to physicians stating that under Chapter 2011-112, practitioners are "prohibited from inquiring about the ownership of firearms or ammunition unless the information is relevant to the patient's medical care or safety, or the safety of others." The letter also stated that Chapter 2011-112 "prohibits a licensed health care practitioner or licensed health care facility from intentionally entering any disclosed information concerning firearm ownership into a patient's health record if the information is not relevant to the patient's medical care or safety, or the safety of others." June 14, 2011 Tootle Letter at 2 (DE 71-1).

14. On July 18, 2011, Ms. Tootle posted a letter to the Florida Board of Medicine's website stating that Chapter 2011-112 is merely hortatory. *See* July 18, 2011 Tootle Letter at 1 (DE 71-3) ("To clarify: the law does not prohibit the asking of such questions, but rather recommends that health care providers and facilities should refrain from asking them.")

15. In an affidavit executed around the same time as the July 18 letter, Ms. Tootle stated that that Chapter 2011-112 does not prohibit physicians from asking patients about firearms. The declaration also stated that Ms. Tootle's June 14, 2011 letter "is not a statement of agency policy and does not represent the viewpoint of the Board of Medicine or bind the Board in any way." *See* Tootle Decl. at 1 (DE 71-2).

16. The American Academy of Pediatrics ("AAP"), the AAP's Florida chapter ("FAAP"), the American Academy of Family Physicians ("AAFP"), and the AAFP's Florida chapter ("FAFP") publish practice guidelines and policy statements recommending that physicians counsel and provide anticipatory guidance on the prevention of injuries. The AAP and the FAAP "recommend that pediatricians incorporate questions about firearms into the patient history process," and both the AAFP and the FAFP have policies stating that firearm

- 6 -

safety education to patients is a necessity. Cosgrove Decl. ¶¶ 10-11, 18 (DE 17) & Ex. 2 at 8-9, 13, 15, 18, 21 (DE 17-2); Raspa Decl. ¶¶ 7-10 (DE 19) & Ex. 2 at 5 (DE 19-2).

17.     The American College of Physicians ("ACP") and its Florida chapter ("FACP") have stated that physicians play a "critical role" in providing preventive injury counseling on diet, exercise, substance abuse, domestic violence, risky recreational activities, use of swimming pools and smoke detectors, and firearms safety. The ACP and the FACP also have adopted a policy statement that firearm injury prevention is a high-priority issue encourages physicians to actively counsel patients about the dangers of firearms in the home and ways to reduce the risk of injury. Himmelstein Decl. ¶ 8, 10-11 (DE 18) & Ex. 2 at 2 (DE 18-2).

18.     Some physicians routinely ask patients and caregivers about various potential health and safety risks, including household chemicals, drugs, alcohol, tobacco, swimming pools, and firearms. Cosgrove Decl. ¶¶ 10, 13 (DE 17); Himmelstein Decl. ¶ 8 (DE 18); Raspa Decl. ¶ 9 (DE 19). Some physicians do not ask every patient about firearms. *See* King Decl. ¶ 8 (DE 25) (stating that she asks patients about firearms during hunting season, when she hears about gun-related accidents, or when the patient is depressed or mentions suicide); Edwards Decl. ¶ 9 (DE 27) (stating that he usually does not ask a patient specifically about firearm ownership unless the patient is depressed).

19.     Some physicians inquire about these and other health and safety risks using screening questionnaires, and other practitioners inquire about these risks verbally. Schaechter Decl. ¶ 9-10 (DE 21); Wollschlaeger Decl. ¶¶ 6-7 (DE 23); Schechtman Decl. ¶ 7 (DE 22); Leland Decl. ¶ 7 (DE 30).

20.     Some physicians or members of the plaintiff organizations hold the opinion that unsecured guns in the home increase risks of injury, especially for minors and those suffering

- 7 -

from depression or dementia.  Himmelstein Decl., Ex. 2 at 8 (DE 18-2); Cosgrove Decl. ¶ 14, 15 (DE 17); Schaechter Decl. ¶ 5-7 (DE 21); Welty Decl. ¶ 4 (DE 31).

21. In some physicians' experiences, patients rarely object to discussions about gun ownership and safety practices, and some patients have expressed gratitude and appreciation for their physician's initiation of a discussion regarding firearms and firearm safety.  Sack Decl. ¶ 8 (DE 29); Gutierrez Decl. ¶ 8 (DE 28); Schaechter Decl. ¶ 11 (DE 21); Welty ¶ 8 (DE 31); Edwards ¶ 13 (DE 27).

22. Some patients, however, have been unwilling to respond to inquiries about firearms or discussions about firearm safety.  Some of those incidents occurred after the passage of Chapter 2011-112.  Schechtman Decl. ¶ 15 (DE 22); Fox-Levine Decl. ¶ 10 (DE 24), Goodman Decl. ¶ 11 (DE 26); Gutierrez Decl. ¶¶ 12-13 (DE 28).

23. Dr. King stated, "Before the law was passed, I felt like my role as a physician gave me standing to strongly advocate for the safety of my patients, including asking about gun ownership and providing advice on that front, and to pursue a discussion with any parents who dismissed off-hand the risks associated with improper storage and handling of firearms."  King Decl. ¶ 11 (DE 25).

24. Dr. Gutierrez stated that after Chapter 2011-112 was passed, he experienced "the first patient of mine ever to object to the firearm question."  The parents of a child "indicated that the patient did not fill out the question regarding firearms," "took a confrontational tone in interacting with me, and insisted that the question regarding firearm ownership was none of my business."  Dr. Gutierrez also said, "Before the law was passed, I would have tried to continue beyond the general statement that pediatricians consider firearm safety a medical issue and go

- 8 -

28613007_3

into specifics, particularly that it is very important, for children's safety, that ammunition and the firearm itself should be kept locked in separate locations." Gutierrez Decl. ¶ 12 (DE 28).

25. Injuries are the leading cause of death and morbidity among children older than one year, adolescents, and young adults. Cosgrove Decl. ¶ 13-14 (DE 17) & Ex. 2, 12 (DE 17-2).

26. Dr. Schaechter believes that if Chapter 2011-112 allows her to ask patients about firearms only if she believes a danger to a patient is imminent, then it will preclude her from offering standard preventive care to her patients. Schaechter Decl. ¶ 13 (DE 21).

27. Dr. Sack and Dr. Fox-Levine believe that Chapter 2011-112, particularly the restriction on asking questions to patients, has diminished the efficacy of their preventive care. Sack Decl. ¶ 12 (DE 29); Fox-Levine Decl. ¶ 16 (DE 24).

28. In the opinion of some Plaintiffs and other physicians, some parents do not understand the risks of firearms and lack knowledge on how to safely store and lock their firearms. King Decl. ¶ 7 (DE 25); Wollschlaeger Decl. ¶ 9 (DE 23).

29. In light of the dangers posed by firearms, several Plaintiffs and other physicians hold the opinion that information about firearm safety is always relevant to a patient's preventive care. Schechtman Decl. ¶ 11 (DE 22); Leland Decl. ¶ 7 (DE 30); Wollschlaeger Decl. ¶¶ 8-9 (DE 23); Edwards Decl. ¶ 13 (DE 27).

30. Several Plaintiffs and other physicians also believe that it is medically relevant to ask patients about firearms even when the patient visits the physician for an unrelated purpose, such as seeking treatment for a cold. Dr. Schaechter, for example, explained that there is not a clear "line between what is a preventive health visit and what is a 'sick' visit." Schaechter Decl. ¶¶ 3-23 (DE 73-3). Dr. Wollschlaeger explained that when a patient visits with the flu, Dr.

- 9 -

Wollschlaeger would ask a series of questions related to preventive medicine.  Wollschlaeger Decl. ¶¶ 3-9 (DE 73-4).

31. Several Plaintiffs and other physicians believe that educating patients about firearm safety and asking questions about the presence of firearms are critical to effective preventive medicine.  Schaechter Decl. ¶¶ 11, 13, 16-17 (DE 21); Goodman Decl. ¶¶ 6, 9 (DE 26); Leland Decl. ¶ 7 (DE 30); Schechtman Decl. ¶¶ 11, 14 (DE 22); Welty Decl. ¶ 4 (DE 31); Wollschlaeger Decl. ¶¶ 8-9 (DE 23).

32. Before the enactment of Chapter 2011-112, Dr. Wollschlaeger asked all of his patients to fill out a preventive-health-related questionnaire that included questions about the presence of guns in the home and whether they were safely locked.  Following the enactment of Chapter 2011-112, Dr. Wollschlaeger deleted those questions from his questionnaire and refrained from discussing firearms as part of his standard preventive counseling.  Wollschlaeger Decl. ¶¶ 6-8, 11-14 (DE 23).

33. Before the enactment of Chapter 2011-112, Dr. Fox-Levine provided an intake questionnaire to parents and relied on parents' answers to determine whether firearms posed any risk to a child and would instruct the parents on safer ways to store their firearms.  Following the enactment of Chapter 2011-112, Dr. Fox-Levine stopped using the questionnaire because she feared disciplinary action.  After the enactment of Chapter 2011-112, she did provide limited, brief, hypothetical verbal counseling to some patients about safe firearm practices.  Fox-Levine Decl. ¶¶ 10-15 (DE 24).

34. Dr. Schaechter "routinely screen[s] all her patients for firearm risks during their annual visits for well-child care, and in some cases on other health visits as well" by using questionnaires that contain questions concerning access to firearms.  Following the passage of

Chapter 2011-112, Dr. Schaechter did not plan to cease using the questionnaire or verbally asking her patients about firearms; however, she was instructed by her employer that all pre-printed materials related to firearms should no longer be used by any physician in the clinical practice. As a result, Dr. Schaechter refrained from using her questionnaire, but she continues to ask patients verbally about firearms. Schaechter Decl. ¶ 9, 15-18 (DE 21).

35. As a result of Chapter 2011-112 and out of fear of facing disciplinary action, several physicians eliminated any written record of consultations with patients about firearms. Some physicians reserved such notations for emergency situations or exigent circumstances. King Decl. ¶ 13 (DE 25); Goodman Decl. ¶ 10 (DE 26); Edwards Decl. ¶ 14 (DE 27).

36. As a result of Chapter 2011-112 and for fear of disciplinary action, some Plaintiffs decline to follow up when patients fail to respond to (or refused to answer) a question about firearms when they previously would have done so. Gutierrez Decl. ¶ 17 (DE 28); Sack Decl. ¶ 11 (DE 29); Schechtman Decl. ¶ 15 (DE 22); Schaechter Decl. ¶ 15, 19 (DE 21).

37. Dr. Gutierrez was afraid that because of Chapter 2011-112, patients would accuse him of harassing them about firearm safety. He ceased to follow up or offer advice to patients who assert that firearms safety is not a medical issue. Gutierrez Decl. ¶¶ 12-13, 17 (DE 28).

38. As a result of Chapter 2011-112 and due to fear of disciplinary action, some physicians re-framed their questions about firearms as indirect or hypothetical questions, which several Plaintiffs believed to be a less effective method of counseling. Sack Decl. ¶¶ 11-12 (DE 29); Fox-Levine Decl. ¶¶ 15-16 (DE 24); King Decl. ¶ 12 (DE 25).

39. Judith Schaechter received an email from the Business Operations Director for the University of Miami Medial Group ("UMMG") on June 10, 2011. The email states, "As some of you probably know, a new statute has been passed in the state of Florida that limits a provider's

ability to ask and record information in the medical record regarding firearm ownership. I am paraphrasing and have attached a link below to the statute that was signed into law this past Friday. Although there is an exception that states 'a health care provider or health care facility that in good faith, believes that the information is relevant to the patient's medical care or safety, or the safety of others, may make such a verbal or written inquiry' I recommend that until leadership along with legal counsel has had a chance to review our current practice along with the statute, we should refrain from using any pre-printed material that contain these type of questions and remove this type of material from the clinic. This is to protect you and the institution. Violation of the statute constitutes grounds for discipline by the Florida Board of Medicine. The disciplinary sanctions can range from a reprimand letter, to a monetary fine, to, theoretically, suspension of the license." Lisa Tobin Jacobson June 10, 2011 Letter (DE 73-2); Schaechter Decl. ¶ 16 (DE 21).

This 11th day of November, 2011.

                Respectfully submitted,

                /s/ Edward M. Mullins_____
                Edward M. Mullins (Fla. Bar No. 863920)
                emullins@astidavis.com
                Hal M. Lucas (Fla. Bar No. 853011)
                hlucas@astidavis.com
                Douglas J. Giuliano (Fla. Bar No. 15282)
                Astigarraga Davis Mullins & Grossman, P.A.
                701 Brickell Avenue, 16th Floor
                Miami, Florida 33131-2847
                Tel.: (305) 372-8282 / Fax: (305) 372-8202

                -and-

                Bruce S. Manheim, Jr.*
                Bruce.manheim@ropesgray.com
                Douglas H. Hallward-Driemeier*
                Douglas.hallward@ropesgray.com

Augustine M. Ripa*
Augustine.ripa@ropesgray.com
Julia M. Lewis*
Julia.lewis@ropesgray.com
Ropes & Gray LLP
700 12th Street NW, Suite 900
Washington D.C. 2005
Tel.: (202) 508-4600 / Fax: (202) 383-8332

-and-

Jonathan E. Lowy*
jlowy@bradymail.org
Daniel R. Vice*
dvice@bradymail.org
Brady Center To Prevent Gun Violence
Legal Action Project
1225 Eye Street NW, Suite 1100
Washington, DC 20005
Tel.: (202) 289-7319 / Fax: (202) 898-0059

*Admitted pro hac vice*

*Counsel for Plaintiffs*


/s/ *Jason Vail*_____
Jason Vail
Jay.vail@myfloridalegal.com
Assistant Attorney General
Office of the Attorney General
PL-01
The Capitol
Tallahassee, Florida 32399-1050
Telephone: (850) 414-3300

*Counsel for Defendants*

- 13 -

- 14 -

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on November 11, 2011, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF filing system. I also certify that the foregoing document is being served this date on all counsel of record or pro se parties on the Service List below in the manner specified, either via transmission of Notices of Electronic Filing generated by the CM/ECF system or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

By: /s/ *Edward M Mullins*_____
    Edward M. Mullins (Fla. Bar No. 863920)

## SERVICE LIST
*Wollschlaeger, et al. v. Farmer, et al.*
Case No.: 11-22026-Civ-COOKE/TURNOFF
United States District Court, Southern District of Florida

Jason Vail
Jay.vail@myfloridalegal.com
Assistant Attorney General
Office of the Attorney General
PL-01
The Capitol
Tallahassee, Florida 32399-1050
Telephone: (850) 414-3300

*Counsel for Defendants*
Electronically served via CM/ECF

Gregory M. Cesarano
gcesarano@carltonfields.com
Carlton Fields, P.A.
Miami Tower
100 Southeast Second Street
Suite 4200
Miami, Florida 33131
Telephone: (305) 530-0050
Facsimile: (305) 530-0055

*Counsel for Amicus Curiae*
   *National Rifle Association*
Electronically served via CM/ECF

Thomas Richard Julin
tjulin@hunton.com
Hunton & Williams
1111 Brickell Avenue
Suite 2500
Miami, Florida 33131
Telephone: (305) 810-2516
Facsimile: (305) 810-2460

*Counsel for Amicus Curiae*
   *American Civil Liberties Union, et al.*
Electronically served via CM/ECF