UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

Case No. 1:11-cv-22026-MGC

**DR. BERND WOLLSCHLAEGER**, et al.,

    Plaintiffs,

v.

**FRANK FARMER**, et al.,

    Defendants.

_____/

# DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

The defendants move for summary judgment pursuant to Fed.R.Civ.P. 56.

# MEMORANDUM OF LAW

For brevity's sake, the defendants adopt the arguments already set out by the defendants and the amicus, the National Rifle Association, in DE 49 and 50-1, and add the following points.

# STATEMENT OF MATERIAL FACTS

The defendants adopt the joint statement of material fact and assert the following additional facts.

    1.    Chapter 2011-112's title states that it is "An act related to the privacy of firearms owners." *Id*. at 1. The chapter creates s. 790.338, Fla. Stat., which in turn is titled "Medical privacy concerning firearms; prohibitions; penalties; exceptions."

    2.    Section 790.388(1) provides that a licensed health care practitioner "may not intentionally enter any disclosed information concerning firearm ownership into the patient's medical record if the practitioner knows that such information is not relevant to the patient's medical care or safety, or the safety of others."

    3.    Section 790.388(2) consists of two parts and provides that a health care practitioner "*shall respect a* patient's right to privacy and *should refrain* from making a written inquiry or asking questions concerning the ownership of a firearm or ammunition by the patient or by a family member of the patient, or the presence of a firearm in a private home or other domicile of the patient or a family member of the patient. Notwithstanding this provision, a

health care practitioner or health care facility that in good faith believes that this information is relevant to the patient's medical care or safety, or the safety of others, may make such a verbal or written inquiry." Emphasis added.

    4.      Section 790.338(4) provides that a "patient may decline to answer or provide any information regarding ownership of a firearm by the patient or a family member of the patient, or the presence of a firearm in the domicile of the patient or a family member of the patient. A patient's decision not to answer a question relating to the presence or ownership of a firearm does not alter existing law regarding a physician's authorization to choose his or her patients."

    5.      Section 790.388(5) provides that "A health care practitioner licensed under chapter 456 or a health care facility licensed under chapter 395 may not discriminate against a patient based solely upon the patient's exercise of the constitutional right to own and possess firearms or ammunition."

    6.      Section 790.338(6) consists of two parts and provides that a health care practitioner "*shall respect* a patient's legal right to own or possess a firearm and *should refrain* from unnecessarily harassing a patient about firearm ownership during an examination." Emphasis added.

    7.      Disciplinary proceedings against physicians are governed by s. 456.073, Fla. Stat. Proceedings may be initiated by the Department of Health or by a complaint from a citizen. A complaint must be in writing, signed by the complainant and legally sufficient. Section 456.073(1), Fla. Stat.  A complaint is legally sufficient if it contains ultimate facts that show a violation of chapter 456 or any of the practice acts governing professions regulated by the Department of Health. *Id*.  The Board of Medicine may also investigate on its own accord if it has reasonable cause to believe a relevant Florida Statute or rule has been violated. *Id*. When an investigation begins, the complaint is sent to the physician and he or she is permitted to respond. *Id*. After a finding of legal sufficiency, the department may dismiss at any time if it determines there is insufficient evidence to support prosecution of the allegations. Section 456.073(2), Fla. Stat. When an investigation concludes, it is referred to a probable cause panel. *Id*. The probable cause panel then votes on whether there is probable cause to believe that a violation has occurred, taking into account the department's investigation and the target's response. Section 456.073(4). Proceedings of the probable cause panel are exempt from the open meetings requirement of s. 286.011, Fla. Stat. until 10 days after the panel has found probable cause.

Section 456.073(4), Fla. Stat. A finding of probable cause provokes an administrative hearing. Section 456.073(5). Complaints dismissed before a finding of probable cause are confidential. Section 456.073(2). The department must follow the instructions of the probable cause panel as to the filing of a complaint. Section 456.073(4), Fla. Stat. However, the department may decline to prosecute the case after the filing of a complaint if it finds that probable cause has been improvidently found. Section 456.073(4), Fla. Stat. In such cases, the department must refer the matter to the Board of Medicine, which may then decide whether to file a formal complaint pursuant to chapter 120, Fla. Stat. A formal hearing under chapter 120 is required for any disputed issues of fact. Section 456.073(5), Fla. Stat. Determinations as to the violation of any statute or rule related to physician conduct are subject to judicial review as final agency action under chapter 120, Fla. Stat. See s. 120.68, Fla. Stat.

8.  Individuals affected by regulatory statutes or administrative rules affecting their professional practice can petition the Board of Medicine for an advisory opinion, technically known as a declaratory statement, pursuant to s. 120.565, Fla. Stat., to seek an interpretation of such statutes or rules. Tellechea dec. p. 2. No plaintiff, nor anyone else, has yet requested such an advisory opinion. *Id.*

## I. THE PLAINTIFFS' CLAIM IS NOT RIPE.

The plaintiffs' claim is unripe because what they intend to do is not prohibited by s. 790.338, Fla. Stat., and no state agency charged with enforcement of that section has issued a policy declaration that their intended conduct violates the law. Consequently, there is no objective, realistic, and impending threat of enforcement sufficient to make the case concrete enough for federal judicial review.

### A. The claims concerning ss. 790.338(1), (2), (5) and (6) are not ripe.

Section 790.338(2) states that health care practitioners "shall respect a patient's right to privacy and should refrain from making a written inquiry or asking questions concerning the ownership of a firearm or ammunition by a patient or by a family member, or the presence of a firearm in a private home or other domicile . . ." But there is a big safety net to the section: practitioners may make this inquiry if they believe "in good faith . . . that this information is relevant to the patient's medical care or safety or the safety of others . . ."

The plaintiffs claim they ask about firearm ownership as a prelude to delivering information to patients about the danger of having firearms in the home. Moreover, the associational plaintiffs claim that they recommend such questions as good medical practice.

Nothing in s. 790.338(2) prohibits any such inquiry into firearm ownership under these circumstances. Such a question, according to the plaintiffs' own assertion, is safety related, and it is evident that they have a good faith basis for believing this. No agency charged with enforcing s. 790.338 has determined that questions about firearm ownership in such circumstances violate the law.

Moreover, nothing in s. 790.338 prohibits any discussion between health care practitioners and their patients about firearm safety. The plaintiffs, however, assert that subsections (5) and (6) chill their speech on firearm safety topics.[1] Subsection (5) prohibits discrimination based solely upon a patient's exercise of the constitutional right to own and posses firearms. Section 790.338(6) instructs that a practitioner "should refrain from unnecessarily harassing a patient about firearm ownership during an examination." On their face, neither subsection prohibits — or in any way inhibits — a discussion about firearm safety. Even if the subsections could be applied against a physician for giving a firearm safety discussion, no state agency charged with enforcement of the statute has interpreted them to apply in such circumstances.

The case's lack of ripeness is evident from application of the principles enunciated by the Eleventh Circuit in *Pittman v. Cole,* 267 F.3d 1269 (11th 2001). In *Pittman*, a free speech case, the plaintiffs (candidates for judicial office and the Christian Coalition of Alabama) sued to enjoin enforcement of Alabama ethics rules governing lawyers and judges after the Alabama Bar issued an informal opinion by a staffer that the candidates would violate the ethics code if they answered a questionnaire put to them by the Coalition. The court considered the four ripeness factors set out in *Ohio Forestry Association Inc. v. Sierra Club*, 523 U.S. 726, 733 (1998), and identified two as most important for its analysis in a case with these facts:

- Claims are less likely to be ripe for adjudication when they venture beyond purely legal issues or when they require speculation about contingent future events.

---

[1] Amended complaint pp. 22-23.

4

- The concern over interference with an agency's decision-making process before it has an opportunity to finalize its policies implicates the fitness of a case for adjudication.

*Pittman*, 267 F.3d at 1278.

The court then noted two additional core concerns: 1) to avoid the entanglement of the federal courts in abstract disagreements over administrative policies, and 2) to protect agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties. *Id.*

The court then concluded: "Consideration of both these concerns leads us to conclude that the plaintiffs' claims against the Bar are not mature for adjudication at this time." *Id.* First, the court said that although it might appear that the plaintiffs' claims involved a pure question of law, there was an important factual component — whether the Alabama Bar would apply the ethics code to the facts pleaded in the complaint. Although the plaintiffs' asserted that the letter from a staffer did constituted sufficient agency intent to enforce the ethics code to their proposed behavior, the court said that a staffer's informal opinion was not the official one. *Id.*

Second, "allowing Alabama's agency charged with overseeing lawyer discipline to formulate and crystallize its policies without undue interference from the federal courts is a good thing, and that also weighs strongly in favor of the conclusion that the plaintiff's claims . . . are premature." *Id.* at 1279.

Before there was any official interpretation of the ethics code, the court said, it faced only a "potential dispute which was founded upon . . . an anticipated belief" that the code would be interpreted in a manner harmful to the plaintiffs. *Id.* at 1279 (internal quotation marks omitted).

The court observed that the *Pittman* plaintiffs could have sought an advisory opinion that might have crystallized into formal agency policy sufficiently enough to confer ripeness. But the plaintiffs did not do so.

The court summed up by saying:

> By foregoing that option and rushing into federal court to seek an injunction, the plaintiffs have not allowed the Bar to formulate a final policy, but instead have asked the district court and now this Court to speculate, without any evidentiary basis, that the Bar's Disciplinary Commission would agree [with the informal opinion]. The ripeness doctrine is designed to prevent federal courts from engaging in such speculation and prematurely and perhaps unnecessarily reaching constitutional issues.

The *Pittman* court then went on, as part of the ripeness analysis, to see whether the plaintiffs would suffer any hardship from the lack of a federal court declaration. In doing so, the court said that only "actual prejudice" to the plaintiffs constituted hardship. *Id.* at 1281. The informal opinion standing alone did not cause the plaintiffs any practical harm. See also *Digital Properties Inc. v. City of Plantation,* 121 F.3d 586 (11th Cir. 1997) (First Amendment challenge to city zoning ordinance unripe because no city official had determined that the ordinance in question applied to the plaintiff).

The district court in *The International Academy of Oral Medicine & Toxicology v. The North Carolina State Board of Dental Examiners*, 451 F.Supp.2d 746 (E.D. N.C. 2006), confronted a medical free speech case very similar to our case. In *International Academy*, the plaintiff (a professional association of dentists) sought injunctive and declaratory relief against a state policy they claimed would prohibit them from informing patients or the public about the dangers of mercury exposure or that mercury fillings could be harmful (among other things the dentists wanted to say). *Id.* at 748. The challenged policy, however, was not a policy at all, but an article in a dentists' newsletter that reflected, not the enforcing agency's interpretation of the law, but a staff person's opinion. Applying *Pittman*, the district court concluded, "it is not clear that the [dental] Board will find any communications that plaintiff's members have made or wish to make involving mercury-related issues in dentistry violate the Board's governing statutes or regulations." *Id.* at 752-753. As to the hardship prong, as in *Pittman*, the court observed that the plaintiffs' members could seek an advisory opinion that "would clarify the legal and factual issues in question, and thereby help to ripen the controversy at hand." *Id* at 753.

The situation confronting this court is indistinguishable from that in *Pittman* and *International Academy*. Section 790.338 does not, on its face, prohibit the speech that the plaintiffs want to make. Nothing in s. 790.338(2) urges the plaintiffs to refrain from asking about firearm ownership if they have a good faith belief that it is necessary for medical or safety reasons. And the plaintiffs contend that such a question is, in fact, reasonably necessary, a claim bolstered by the practice guidelines promulgated by the associational plaintiffs. Moreover, no state agency charged with enforcement of s. 790.338 has interpreted the statute to prohibit such a question based on the facts alleged by the plaintiffs. (Indeed, any determination whether a given question about firearm ownership violates s. 790.338 requires an inquiry into the specific facts and circumstances surrounding the practitioner-patient relationship and the patient's

6

individualized needs. Thus, the plaintiffs really have made out an unripe as-applied challenge to the statute, not a facial one.)

Similarly, nothing in s. 790.338(5) concerning discrimination or (6) concerning "unnecessary harassment" on their face proscribes a discussion about firearm safety. And no enforcing agency has yet construed this section to prohibit such a discussion.[2]

At best, the plaintiffs offer evidence of the thoughts of the Board of Medicine's executive director and a determination of a Board committee; neither constitute an official statement of Board policy. Under *Pittman* and *International Academy*, the executive director's letter and the committee's determination are of no moment: they do not constitute the sort of focused official determination *Pittman* requires. Nothing in this record indicates how the Board itself will interpret s. 790.338 and whether it will sanction any practitioner for speaking as the plaintiffs wish to do. As the *Pittman* court said, "the plaintiffs have not allowed the [Board] to formulate a final policy" nor have they allowed the Board "to formulate and crystallize its policies without undue interference from the federal courts." *Pittman*, 267 F.3d at 1279, 1280.

Last, the plaintiffs could have sought an advisory opinion about the meaning of the various provisions in s. 790.338. Section 120.565(1), Fla. Stat., allows any "substantially affected person [to] seek a declaratory statement regarding an agency's opinion as to the applicability of a statutory provision, or of any rule or order of the agency, as it applies to the petitioner's particular set of circumstances." However, none of the plaintiffs availed themselves of this opportunity.

In sum, the plaintiffs merely have an "anticipated belief" that a law will be interpreted in such a way as to violate their First Amendment rights, making the action is unripe. *Digital Properties Inc. v. City of Plantation*, 121 F.3d at 590-591

---

[2] The word "unnecessary" indicates that the Florida Legislature intended any enforcing agency to take into account all the facts and circumstances of any harassment complaint. That is, if the practitioner can show, because of the patient's circumstances, that the acts alleged to be harassment were medically necessary, one struggles to see how the practitioner will have violated that subsection. But most significantly: the need to probe the facts and circumstance mean the claim is in fact an as-applied rather than facial challenge, unripe in the case's present condition.

Section 790.338(1) addresses the recording of information about firearm ownership in a patient's medical record. Practitioners are instructed not to record such information unless it is "relevant to the patient's medical care or safety, or the safety of others."

The plaintiffs' claims concerning this provision are unripe for the same reason as their claims against subsections (2), (5) and (6): it is not clear that the section prohibits the recording of such information under the circumstances set out in the amended complaint, no state enforcing agency has determined that such conduct violates the law, and the plaintiffs have not sought a declaratory statement to clarify and crystallize agency policy on the question.

## II. THE PLAINTIFFS LACK STANDING.

### A. The plaintiffs' fears about the prospect of enforcement of s. 790.338 are not objectively reasonable and therefore any "chilling" of the exercise of First Amendment rights is insufficient to confer standing.

The plaintiffs have the burden of establishing their standing to attack the provisions of s. 790.338, which requires them to show that:

> (1) the plaintiff ... suffered an injury in fact-an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) there must be a causal connection between the injury and the conduct complained of-the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court; and (3) it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Bloedorn v. Grube*, 631 F.3d 1218, 1228 (11th Cir. 2011).

The chilling of First Amendment protect speech in the face of imminent enforcement of a statute affecting speech can constitute sufficient injury-in-fact to confer Article III standing if a plaintiff's subjective fear that he will be prosecuted is "objectively reasonable." *Wilson v. State Bar of Ga.*, 132 F.3d 1422, 1428 (11th Cir.1998); *Laird v. Tatum*, 408 U.S 1 (1972).

The "mere assertion of a chill is insufficient to demonstrate an injury in fact." *Dermer v. Miami –Dade County*, 599 F.3d 1217, 1221 (11th Cir. 2007), citing *Laird v. Tatum*, 408 U.S. at 13-14. The plaintiff must state facts supporting the existence of an actual, well-founded fear. *Dermer*, 599 F.3d at 1220

A fear is actual and well founded when an agency charged with enforcement of the challenged law takes specific action that constitutes a credible threat of enforcement. *Morrison v. Board of Education of Boyd County*, 521 F.3d 602, 609 (6th Cir. 2008); *Rock for Life-UMBC v.*

*Hrabowski*, 411 Fed.Appx. 541, 549 (4th Cir. 2010); *281 Care Committee v. Arneson*, 638 F.3d 621, 627 (8th Cir. 2011).

Even if the harm ultimately feared is to reputation, an overt act by the enforcing agency is still required to confer standing. *Meese v. Keene*, 481 U.S. 465, 468 n. 1 (1987) (harm to reputation was sufficient to confer standing, but the court noted that the enforcing agency had still sought to enforce the challenged act).

Here, as to the provisions concerning questions about firearm ownership and potential discrimination and harassment by delivery of a gun safety message, the plaintiffs' fears of a chilling of their speech are wholly subjective and not objectively reasonable.

As pointed out above concerning the relevant subsections, the text of the law does not expressly prohibit the speech which the plaintiffs wish to make. Whether that speech in fact violates the law requires legal interpretation in light of the relevant facts by a state agency charged with enforcement, a determination that is subject to state judicial review after an enforcement proceeding. See s. 120.68, Fla. Stat. Thus, they face no credible threat of enforcement of the statute.

Therefore, the plaintiffs' fears that their speech rights are chilled by the mere existence of s. 790.338 are wholly subjective, and they lack Article III standing.

**B.** **The plaintiffs have stated no harm from the provisions requiring practitioners to respect a patient's right to privacy and the right to own a firearm.**

In the order on preliminary injunction, the court enjoined enforcement of all of subsections (2) and (6). But there are parts of those subsections which the plaintiffs have not alleged, and cannot demonstrate, have caused them any harm.

Specifically, s. 790.338(2) also requires practitioners to "respect a patient's right to privacy," while subsection (6) also requires practitioners to "respect a patient's legal right to own and possess a firearm."

These provisions are independent and freestanding from the remainder of the matters in their respective subsections and can be severed from the remainder, if those other parts are found to be unconstitutional. See e.g., *Scott v. Roberts*, 612 F.3d 1279, 1297-1298 (11th Cir. 2010).[3]

Nothing in the plaintiffs' voluminous papers gives any hint they are harmed by these two statutory requirements. The amended complaint alleges no injury in fact from the existence or operation of these two statutory phrases. Moreover, it is inconceivable that the plaintiffs, in good faith, either could allege or attempt to prove that these two phrases invade a legally protected interest. See e.g., *Florida Family Policy Council v. Freeman*, 561 F.3d 1246, 1253 (11th Cir. 2009) (invasion of a legally protected interest necessary for standing).

Consequently the plaintiffs do not have standing to seek invalidation of these portions of subsections (2) and (6).

### C. The plaintiffs have alleged no injury from the operation of ss. 790.338(3) and (7).

Section 790.388(3) is directed to emergency medical technicians. Subsection (7) is directed to insurers. None of the individual plaintiffs are emergency medical technicians or insurers, and the associational plaintiffs do not allege that their members are medical technicians or insurers.

The individual plaintiffs cannot, of course, attack a provision that causes them no harm. The associational plaintiffs have no standing because they have not alleged that any of their members is an emergency medical technician or insurer.[4] See *Florida Wildlife Federation Inc. v. South Florida Water Management District*, 647 F.3d 1296, 1302 n. 4 (11th Cir. 2011) ("If the

---

[3] "Florida 'clearly favors (where possible) severance of the invalid portions of a law from the valid ones.' *Solantic*, 410 F.3d at 1269 n. 16 (internal quotation marks omitted). Florida employs a well-established four-part test to determine whether severance is appropriate: (1) the unconstitutional provision can be separated from the remaining valid provisions; (2) the legislative purpose of the act can be achieved without the invalid provision; (3) the valid and invalid features are not so inseparable that the legislature could only have wanted them to exist together; and (4) a complete act remains after severance. *Women's Emergency Network v. Bush*, 323 F.3d 937, 948-49 (11th Cir.2003). Here, as is 'in almost any case,' we can easily separate the excess spending subsidy from the remainder of the Act and the Act remains complete even after severance."

[4] See amended complaint pp. 5-6.

plaintiff is an organization, then under the doctrine of associational standing only one of its members needs to satisfy the case-or-controversy requirement in order for the organization to have standing to litigate the claim, so long as the interests at stake are germane to the organization's purpose and neither the claim nor the relief involved require the individual members' participation.")

### D. The plaintiffs have alleged no injury from the operation of s. 790.338(4).

Section 790.338(4) recognizes that a patient has a right to decline to provide information about the ownership of firearms — just as a patient has a right to refuse to answer *any* questions put to them by a medical practitioner. See e.g., *Cruzan v. Director, Missouri Dep't of Health*, 497 U.S. 261, 278 (1990) (competent person has a constitutional right to refuse medical treatment). The statute leaves the choice of whether to discuss firearms where it belongs — with the patient, who can agree to talk about the subject or not.

The plaintiffs do not seem to assert a right to force a message upon an unwilling listener, nor do they have any such right.[5] (However, the statements of some plaintiffs indicate that in the past they have overriden patients' desires not to have a conversation about firearm ownership and safety.) Nor have they alleged any harm arising from the existence or operation of this subsection, and therefore the plaintiffs have no standing to attack it.

### II. FLORIDA HAS A COMPELLING INTEREST IN PROTECTING THE EXERCISE OF THE FUNDAMENTAL RIGHT TO KEEP AND BEAR ARMS AND IN PROTECTING INDIVIDUALS FROM DISCRIMINATION WHO WISH TO EXERCISE THAT RIGHT.

The right to keep and bear arms for personal protection is guaranteed by the U.S. and Florida Constitutions. Second Amendment; Art. I, s. 8, Fla. Const. It is a fundamental right. *McDonald v. City of Chicago*, 130 S. Ct. 3020, 3036-3037 (2010).

Government has a compelling interest in protecting fundamental rights from infringement by private individuals. *Roberts v. U.S. Jaycees*, 468 U.S. 609, 628 (1984) (sex discrimination by private association); *Bob Jones University v. U.S.,* 461 U.S. 574 (1983) (racial discrimination at

---

[5] The allegations in the amended complaint make clear that not all the plaintiffs' patients wish to discuss the ownership of firearms or hear their firearm safety information. Amended complaint pp. 26-27, 29, 30, 32, 33

11

private, religious university); *Burson v. Freeman*, 504 U.S 191, 199, 208 (1992) (right to vote); *Saxe v. State College Area School District*, 240 F.3d 200, 209 (3d Cir. 2001) (compelling interest in preventing discrimination in the work place and schools). The government may act to protect the exercise of fundamental rights even if the means chosen places a burden on the exercise of another fundamental right by other individuals. *Bob Jones University v. U.S. supra* (government's interest outweighed university's First Amendment religious interest and means chosen by government permissibly burdened university's religious rights); *Frazier v. Winn*, 535 F.3d 1279, 1284-1285 (11th Cir. 2008).

In addition, s. 790.338 protects *privacy* rights in order to shield patients from discrimination and harassment in the receipt of medical care. See Chapter 2011-112$^{6/7}$. Florida has a compelling interest in protecting individuals' privacy rights related to the ownership of firearms or the presence of firearms in the home and in protecting them from barriers to the receipt of medical care arising from discrimination or harassment based on firearm ownership.

The plaintiffs assert that patients have no privacy interest because gun ownership information is collected during the purchasing process under s. 790.065, Fla. Stat., and during application for a concealed carry permit under s. 790.06, Fla. Stat. While the state has required firearms owners to share information with the state as part of the reasonable regulation of the use of firearms, the plaintiffs' argument overlooks the considerable privacy protections Florida has conferred on that information, shielding it from disclosure to third parties. First, 790.065 only governs purchases from a licensed dealer, not private sales. And the application for a concealed carry permit does not necessarily mean the applicant is a gun owner, although it may imply ownership. Second, the legislature has provided for confidentiality protection for both information gathered during gun purchases and applications for a concealed carry permit. See ss. 790.0601 and 790.065(4). In fact, information collected during purchases which is sent to the

---

[6] The title to the chapter identifies the measure as "An act related to the *privacy* of firearm owners."

[7] The right to privacy in the home is secured by the federal constitution for many purposes, e.g., *Hudson v. Michigan*, 547 U.S. 586, 621 (2006) (an individual's right of privacy in his house has long been recognized in Anglo-American law), and *Lawrence v. Texas,* 539 U.S. 558 (2003); and by the Florida Constitution. Art. I, s. 23, Fla. Const.

Department of Law Enforcement for conducting the required background check is not only confidential, but must be destroyed within 48 hours of notifications to the licensee. Section 790.065(4)(a). Concealed carry information can only be obtained with the applicant's permission, by court order, or by a law enforcement agency. Section 790.0601(2). These measures indicate that the Legislature has already recognized the need for heightened confidentiality protection on information concerning gun ownership.

The limitation about recording firearm ownership information in a patient's medical records works in tandem with the prohibitions against discrimination and harassment. As well be seen below, the recommendation against asking "the question" serves to protect the patient from disclosing his or her membership in a class now protected from discrimination and harassment. Limitations about recording similar information in the medical record prevent dissemination of such information to others working in a practitioner's office who may be inclined to discriminate against a patient based on his or her membership in the protected class.

Finally, the state has a compelling interest in the regulation of professions, such as the delivery of medical care. *Goldfarb v. Virginia Bar*, 421 U.S. 772, 792 (1975) ("We recognize that the States have a compelling interest in the practice of professions within their boundaries, and that as a part of their power to protect the public health, safety, and other vital interests, they have broad power to establish standards for licensing practitioners and regulating the practice of professions."). It is fully within Florida's authority to regulate the medical profession so as to inhibit discrimination and harassment in the delivery of medical care, even when speech is involved. "During a doctor-patient conversation physicians are engaging in the practice of medicine, which has a long history of being regulated to protect public safety. . . [W]hen a doctor's speech is part of his practice of medicine, it may be subject to 'reasonable licensing and regulation.'" *Pearson v. McCaffrey*, 139 F.Supp.2d 113, 121 (D.D.C. 2001).

Therefore, Florida has a compelling interest in the enforcement of all provisions of s. 790.338.

### III. SECTION 790.338(2) IS AN ACCEPTABLE MEANS OF FURTHERING FLORIDA'S INTEREST IN PROTECTING THE PRIVACY OF FIREARMS OWNERS.

Section 790.338 identifies a class of individuals to be protected from discrimination and harassment in the delivery of medical care and instructs practitioners to refrain from seeking information that identifies a patient as a member of that class so as to inhibit discrimination,

when gathering that information is not medically necessary. Allowing the patient to conceal his membership in the protected class is the least restrictive means of furthering Florida's interest in preventing discrimination on the basis of class membership.

The means selected is a widely-accepted and widely-employed mechanism in anti-discrimination law, designed, as this one, to protect the fundamental rights of the person subject to interrogation. In fact, Congress has expressly prohibited certain specific questions related to protected class membership:

> (1) In general. The prohibition against discrimination as referred to in subsection (a) shall include medical examinations and **inquiries**.
>
> (2) Preemployment
>
> (A) **Prohibited** examination or **inquiry**
>
> Except as provided in paragraph (3), a covered entity shall not conduct a medical examination or make inquiries of a job applicant as to whether such applicant is an individual with a disability or as to the nature or severity of such disability.
>
> (4) Examination and inquiry.
>
> (A) Prohibited examinations and inquiries. A covered entity shall not require a medical examination and **shall not make inquiries of an employee as to whether such employee is an individual with a disability or as to the nature or severity of the disability**, unless such examination or inquiry is shown to be job-related and consistent with business necessity.

Americans with Disabilities Act, 42 U.S.C. s. 12112(d)(2). Emphasis added.

The cases consistently say that prohibiting certain questions in order to inhibit discrimination is lawful. See *Harrison v. Benchmark Electronics of Huntsville Inc*., 593 F.3d 1206, 1212 (11th Cir. 2010) (unlawful to make preemployment inquiries about the presence of a disability); *Barbano v. Madison County*, 922 F.2d 139, 143 (2d Cir. 1990) (woman questioned about her plans for a family per se unlawful under Title VII without business need); *Ford v. St. Elizabeth Hosp*., 1993 WL 330036 *5 (N.D. N.Y. 1993) (question about "when are you due?" "clearly inappropriate" in job interview); *Harris v. Syracuse University,* 168 A.D.2d 791, 564 N.Y.S.2d 227, (N.Y.A.D. 3 Dept. 1990) (question about medical condition inappropriate); *Lee v. City of Columbus, Ohio*, 636 F.3d 245, 255 (6th Cir. 2011) (citing "24 C.F.R. § 8.13(a) (Rehabilitation Act regulation providing that 'a recipient may not make a preemployment inquiry or conduct a preemployment medical examination of an applicant to determine whether the applicant is an individual with handicaps or the nature or severity of a handicap.)'").

The subsection under attack, s. 790.338(2), is carefully drafted so that it operates no differently than 42 U.S.C. s. 12112(d)(2). Like the federal law, it urges doctors to refrain from posing questions intended to obtain facts that identify the patient as a member of the protected class unless there is a medical or safety-based reason for the inquiry.[8]

Consequently, s. 790.338(2) is constitutional.

## IV. THE PROSCRIPTIONS AGAINST DISCRIMINATION AND HARASSMENT ARE CONSTITUTIONAL.

Sections 790.338(5) and (6) addressing discrimination and unnecessary harassment based on the exercise of fundamental Second Amendment rights are, as we have seen, supported by a compelling state interest. They are anti-discrimination provisions no different from many similar provisions in federal law, and are just as constitutional.

### A. Sections 790.338(5) and (6) are no different than many anti-discrimination provisions of federal law.

Federal law outlaws discrimination and harassment of individuals because of their membership in many protected classes.

For example, Title VII outlaws discrimination in the workplace using language not unlike that used in s. 790.338(5) and (6):

(a) Employer practices

It shall be an unlawful employment practice for an employer--

(1) to fail or refuse to hire or to discharge any individual, or **otherwise to discriminate** against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or

(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

42 U.S.C. s. 2000e-2. See also, 20 U.S.C. s. 1681(a); 29 U.S.C. s. 623; 42 U.S.C. s. 794; 42 U.S.C. s. 1395(f)(1)(C); 42 U.S.C. s. 1396A(w)(1)(C); 42 U.S.C. s. 12132; 42 U.S.C. s. 2000d.

---

[8] The test, of course, is actually more lenient than this. A practitioner need only show that he had a good faith basis to *believe* there was a medical or safety reason for asking about firearms. He need not show that there actually was such a reason.

15

While most of these federal statutes do not address "harassment" per se, courts have interpreted "discrimination" to include harassment based on membership in the protected class. See *Harris v. Forklift Systems Inc.*, 510 U.S. 17, 21 (1993) (the statute "evinces a congressional intent 'to strike at the entire spectrum of disparate treatment of men and women' in employment,' which includes requiring people to work in a discriminatorily hostile or abusive environment.").

Here, ss. 790.338(5) and (6) create a protected class of individuals who own firearms, and directs that they should be free from discrimination and unnecessary harassment because of that fact.

If ss. 790.338(5) and (6) are constitutionally infirm, all similar federal anti-discrimination law is equally suspect.

### B. Sections 790.338(5) and (6) are not "content based."

Sections 790.338(5) and (6) are not on their face directed at suppressing speech and, whatever their context, cannot reasonably be read to target speech alone.

Subsection (5) addresses "discrimination" while (6) addresses "unnecessary harassment." The plain language of these provisions does not limit their application only to speech-based discrimination or harassment. Discrimination and harassment can take many forms, not all involving speech. Conduct alone can, and often does, amount to unlawful discrimination or harassment. *Saxe v. State College Area School Dist.*, 240 F.3d 200, 206 (3d Cir. 2001) ("There is of course no question that non-expressive, physically harassing conduct is entirely outside the ambit of the free speech clause.").

Therefore, since discrimination and harassment can, as a matter of common sense, be carried out by conduct, subsections (5) and (6) cannot reasonably be read to apply only to speech. They may be applied to speech, but they may also be applied to nonexpressive conduct, depending on the facts.

Because these subsections can be lawfully applied to nonexpressive conduct, the plaintiffs' facial challenge fails as a matter of law. *D.A. Mortg., Inc. v. City of Miami Beach*, 486 F.3d 1254 (11th Cir. 2007) (for facial challenge to succeed, plaintiff must show that challenged act can never be applied in constitutional manner). Any claim that the plaintiffs' speech is suppressed by (5) and (6) is an as-applied challenge which is unripe.

### C.   Even if applied to speech-based discrimination and harassment, ss. 790.338(5) and (6) are constitutional.

The Supreme Court has "strongly suggested" that hostile environment claims based on speech do not implicate the First Amendment. *Baty v Williamette Industries Inc.,* 172 F.3d 1232, 127 (10th Cir. 1999). Consequently, hostile environment "harassment" cases frequently are based on the speech of others. See e.g., *Hrobowski v. Worthington Steel Co.,* 358 F.3d 473 (7th Cir. 2004).

Title VII, for example, does not explicitly provide for a hostile environment claim. One has been inferred from the text of the statute as a species of discrimination. *Harris v. Forklift Systems Inc.*, 510 U.S. 17, 21 (1993).

Courts permitting such a hostile environment claim as a form of discrimination or harassment limit its scope significantly so as not to embrace speech that might otherwise be protected; the test is:

> "[A] plaintiff must show that he or she is a member of a protected group, that there was 'unwelcome harassment,' that there was a causal nexus between the harassment and membership in the protected group, and that the harassment affected a term, condition, or privilege of employment." Williams v. ConAgra Poultry Co., 378 F.3d 790, 794 (8th Cir.2004). To the extent non-supervisory employees are responsible for the harassment, "the plaintiff must also show that the employer knew or should have known about the harassment but failed to take proper action." Id. at 794-95.
>
> Harassment which is severe or pervasive is "deemed to affect a term, condition, or privilege of employment." Singletary v. Mo. Dep't of Corr., 423 F.3d 886, 892 (8th Cir.2005). The standard is a demanding one, and "[s]imple teasing, offhand comments, and isolated incidents (unless extremely serious)" will not suffice. Arraleh v. County of Ramsey, 461 F.3d 967, 979 (8th Cir.2006) (quotations omitted). Additionally, "[m]ere utterance of an epithet which engenders offensive feelings in an employee does not sufficiently affect the conditions of employment to support a claim of hostile work environment." Id. (quotation omitted). To sustain a claim, the workplace must be "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Singletary, 423 F.3d at 892 (quotation omitted). Further, the hostile work environment must be both objectively and subjectively abusive. See Woodland v. Joseph T. Ryerson & Son, Inc., 302 F.3d 839, 843 (8th Cir.2002).
>
> Rather, as often stated, the inquiry requires a consideration of the totality of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work

>performance." Arraleh, 461 F.3d at 979 (quotation omitted). The court may also consider the "physical proximity to the harasser, and the presence or absence of other people." Carter v. Chrysler Corp., 173 F.3d 693, 702 (8th Cir.1999). "Harassment need not be so extreme that it produces tangible effects on job performance or psychological well-being to be actionable." Id. (citing Harris v. Forklift Sys., Inc., 510 U.S. 17, 22, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)). We remain cognizant of the fact that "[a] work environment is shaped by the accumulation of abusive conduct, and the resulting harm cannot be measured by carving it into a series of discrete incidents." Carter, 173 F.3d at 702 (quotations omitted).

*Watson v. CEVA Logistics U.S. Inc.,* 619 F.3d 936, 941-943 (8th Cir. 2010).

Florida interprets its civil rights laws such as those in chapter 760, Fla. Stat., consistently with federal law. *Natson v. Eckerd Corp. Inc.,* 885 So.2d 945, 947 (Fla. 4th DCA 2004)[9].

The court can and should place a similarly limiting construction on the discrimination/harassment portions of s. 790.338. See *Saxe v. State College Area School District*, 240 F.3d 200, 215 (3d Cir. 2001) (court must give narrowing construction to statute to avoid unconstitutionality if at all possible). Such a narrowing construction would yield the following test: (1) the plaintiff is a member of a protected group; (2) he or she was the subject of unwelcome harassment or discrimination based upon the ownership of a firearm; (3) the discrimination or harassment occurred because of the ownership of a firearm; and (4) the harassment was sufficiently severe or pervasive to alter his or her ability to access medical care.

Given this narrowing construction, s. 790.338's discrimination/harassment provisions are consistent with federal anti-discrimination law and, therefore, are constitutional in this facial challenge.

---

[9] Holding that to establish a prima facie case of hostile work environment sexual harassment, a plaintiff must establish: (1) he or she is a member of a protected group; (2) he or she was the subject of unwelcome sexual harassment; (3) the harassment occurred because of his or her sex; and (4) the harassment was sufficiently severe or pervasive to alter the terms and conditions of his or her employment.

## V. THE STATE MAY REGULATE THE CONTENTS OF MEDICAL RECORDS AS AN INCIDENT TO ITS REGULATION OF THE MEDICAL PROFESSION.

State regulation of the medical profession is in the public interest, and states have "great latitude" to regulate it. *Zahl v. Harper,* 282 F.3d 204, 211 (3d Cir. 2002); *England v. Louisiana State Board of Medical Examiners,* 263 F.2d 661, 674 (5th Cir. 1959).

Incident to its regulation of the practice of medicine, the state may impose recordkeeping requirements on physicians. See e.g., *Planned Parenthood of Central Missouri v. Danforth,* 428 U.S 52, 79-80 (1976).

The prohibition in s. 790.338(1) against recording information about firearm ownership when not medically necessary serves the same purpose as the limitation on gathering such information in the first place: it protects the patient from revealing membership in the protected class and helps stifle discrimination and harassment. See e.g., *Karraker v. Rent-a-Center Inc.,* 316 F.Supp.2d 375 (C.D. Ill. 2004), *affirmed in part, reversed on part*, 411 F.3d 831 (7th Cir. 2005) (psychological test that could be read to reveal mental disability improperly required and placed in personnel file where it was available to managers considering employee for promotion in violation of the ADA). As such, it is a reasonable regulation of the practice of medicine, well within the state's regulatory authority.

## CONCLUSION

For these reasons, and those stated in the defendants' memorandum in opposition to the plaintiffs' motion for preliminary injunction and the National Rifle Association's amicus brief, the court should grant judgment to the defendants.

Respectfully submitted,

PAMELA JO BONDI
ATTORNEY GENERAL

s/ *Jason Vail*

Jason Vail
Florida Bar no. 298824
Assistant Attorney General

Diane G. Dewolf
Florida Bar no. FBN 59719
Deputy Solicitor General

Office of the Attorney General
PL-01, The Capitol
Tallahassee, FL 32399
(850) 414-3300

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing has been furnished to counsel of record through use of the Court's CM/ECF system on November 14, 2011.


s/ *Jason Vail*