## UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF FLORIDA

### Case No. 11-22026-Civ-COOKE/TURNOFF

BERND WOLLSCHLAEGER, *et al*.,

      Plaintiffs

vs.

FRANK FARMER, *et al*.,

      Defendants.

_____/

## OMNIBUS ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT

THIS MATTER is before me on the Defendants' Second Amended Motion for Summary Judgment (ECF No. 93) and Plaintiffs' Motion for Summary Judgment (ECF No. 86). I have reviewed the arguments, the record, and the relevant legal authorities. For the reasons provided in this Order, Plaintiffs' Motion is granted and Defendants' Motion is granted in part.

### I. BACKGROUND

The parties have relied primarily on the evidence previously provided to the Court in support and in opposition to Plaintiffs' Motion for Preliminary Injunction. Although I have already recited the facts and the evidence in my Order granting Plaintiffs' Motion for Preliminary Injunction (ECF No. 80) (hereinafter, the "Preliminary Injunction Order"), I will restate them here by way of background.

On June 2, 2011, Governor Rick Scott signed into law "[a]n Act relating to the privacy of firearm owners" (hereinafter, the "Firearm Owners' Privacy Act" or the "Act"). CS/CS/HB 155 (codified at Fla. Stats. §§ 790.338, 381.026, 456.072, 395.1055). The bill created Fla. Stat. § 790.338, entitled "Medical privacy concerning firearms; prohibitions; penalties; exceptions," and amended other scattered statutes.

Pursuant to § 790.338, licensed health care practitioners or facilities (collectively,

"practitioners") may not (i) intentionally record any disclosed information concerning firearm ownership in a patient's medical record if the practitioner knows the information is not relevant to the patient's medical care or safety, or the safety of others (the "record-keeping provision"); (ii) ask a patient whether she owns a firearm unless the practitioner in good faith believes the information is relevant to the patient's medical care or safety, or the safety of others (the "inquiry restriction provision"); (iii) discriminate against a patient based solely on firearm ownership (the "anti-discrimination provision"); or (iv) unnecessarily harass a patient about firearm ownership (the "anti-harassment provision").[1]  Violation of any provision of the law constitutes grounds for disciplinary action under Fla. Stats. §§ 456.072, 395.1055.

Pursuant to Fla. Stat. § 456.073, disciplinary proceedings may be initiated against a practitioner by the Department of Health or through a citizen's complaint.  After determining that the complaint is legally sufficient, the Department of Health refers it to a probable cause panel.  The probable cause panels are exempt from the open meetings requirement in Fla. Stat. § 286.011 until ten days after the panel has found probable cause.  Complaints dismissed before a finding of probable cause are confidential.  The Department of Health may decline to prosecute a case if it finds that the panel "improvidently found" probable cause.  § 456.073(4).  The Department of Health may also dismiss a complaint at any time if it determines there is insufficient evidence to support prosecution of the allegations.  Any disputed facts are resolved in a formal hearing.  All final agency actions are subject to judicial review.

## A.  Legislative History and State's Clarification of the Law

According to legislative findings, the State passed the Act at least in part as a reaction to an incident in Ocala, Florida, where a physician advised the mother of a minor patient that she had

---

[1] The law also contains provisions governing emergency medical technicians or paramedics and insurance companies, and provides that a patient may refuse to answer questions regarding firearms.  *See* § 790.338(3), (4), (7).  These provisions are not subject to the Plaintiffs' challenge in this action, and, as noted below, Plaintiffs do not have standing to challenge them.  (*See* Compl. ¶¶ 58-62).

thirty days to find a new pediatrician after the mother refused to answer questions about firearms in her home.  Fla. Health & Human Servs. Comm., H.R. Staff Analysis, H.R. 0155C, at 1 (Apr. 7, 2011) (ECF No. 20-3); Fla. Judiciary Comm., H.R. Staff Analysis, H.R. 0155E, at 1 (Apr. 12, 2011) (ECF No. 20-4).  The House of Representatives' Staff Analysis notes that "Florida law does not contain any provision that prohibits physicians or other medical staff from asking a patient whether he or she owns a firearm or whether there is a firearm in the patient's home."  Fla H.R. 0155C, at 2; Fla H.R. 0155E, at 2.  This law was presumably a means to rectify this perceived gap in Florida laws.

The legislative debates on this bill reveal that the legislature relied heavily on anecdotal information about physicians asking patients about firearm ownership, physicians misrepresenting that Medicaid would not pay out claims if the patient did not answer questions regarding firearms, or physicians refusing to conduct examinations on patients who refused to answer questions about firearm ownership.  It does not appear that the Florida legislature relied on any studies, research, or statistics on physicians' practices or patients' experiences on this issue.

At the preliminary-injunction stage of this litigation, the State clarified that the Firearm Owners' Privacy Law "is directed at prohibiting the forced disclosure of firearm ownership by patients during the course of the provision of medical care, as well as the prevention of harassment and discrimination by health care providers against patients based on their ownership of firearms." (Defs.' Resp. to Mot. for Prelim. Inj. 1).  The State maintained that the "primary constitutional right at issue in this litigation" is the right to "keep arms."  (*Id*. at 2).  According to the State, "the sole focus of the act is the protection of patients who own firearms from the compelled disclosure of the fact they are exercising the constitutional right to possess (i.e., keep) firearms."  (*Id*. at 4-5).

At the summary-judgment stage of litigation, the State appears to recast its reading of the Act as mainly an anti-discrimination and harassment bill.  The State maintains that "Section

790.338 is a run-of-the-mill anti-discrimination law . . . ."  (Defs' Resp. to Pls.' Mot. for Summ. J. 1).   The State notes, "Section 790.338 prohibits discriminatory or harassing conduct, but incidentally burdens speech, if at all, by limiting the type of questions a practitioner can make in the medical treatment setting in the absence of medical necessity (subsection 2) and the recording of information in the medical record where [it] is available to others who may be tempted to discriminate."  (*Id*. at 4).

## B.  Practice of Preventive Medicine

Plaintiffs provide evidence that, as part of the practice of preventive medicine, practitioners routinely ask and counsel patients about a number of potential health and safety risks, including household chemicals, swimming pools, drugs, alcohol, tobacco, and firearms.   Some practitioners use patient and parent screening questionnaires for new patients or patients scheduled for annual check-ups, in which they ask about a variety of health and safety risks, including access to firearms. (*See, e.g.*, Schaechter Decl. ¶ 9; Wollschlaeger Decl. ¶¶ 6-7).   Some physicians also orally inquire about risks, including firearms, during other types of patient visits.   (*See, e.g.*, Schaechter Decl. ¶ 10; Schechtman Decl. ¶ 7).   Several plaintiffs and other physicians state that information about firearm safety is always relevant to a patient's preventive care.   (*See, e.g.*, Leland Decl. ¶ 7; Edwards Decl. ¶ 13).   Several plaintiffs and other physicians state that the law interferes in the doctor-patient relationship and has resulted in diminished efficacy of their practice of preventive medical care.  (*See, e.g.*, Schechtman Decl. ¶ 12; Leland Decl ¶ 12; Wollschlaeger Decl. ¶ 11; Sacks Decl ¶ 12; Fox-Levine Decl. ¶ 16).

The American Academy of Pediatrics ("AAP") and its Florida chapter ("FAAP"), as well as the American Academy of Family Physicians ("AAFP) and its Florida chapter ("FAFP"), publish practice guidelines and policy statements that recommend that physicians provide counseling and anticipatory guidance on the prevention of injuries.  (Cosgrove Decl. ¶ 10; Raspa Decl. ¶¶ 7-8).

Part of such counseling and guidance involves counseling patients and families on matters including diet, second-hand smoke, alcohol abuse, household chemicals, use of swimming pools, use of bicycle helmets, automotive safety, and firearms safety.  (Cosgrove Decl. ¶ 14; Raspa Decl. ¶ 9). Similarly, the American College of Physicians ("ACP") and its Florida chapter ("FACP") advance the position that a physician has a "critical role" in providing preventive injury counseling on diet, exercise, substance abuse, domestic violence, risky recreational activities, use of swimming pools and smoke detectors, and firearms safety.  (Himmelstein Decl. ¶ 8).

On June 24, 2011, Plaintiffs, physicians and physician interest groups, filed a First Amended Complaint alleging that the Firearm Owners' Privacy Act violates the First and Fourteenth Amendments of the U.S. Constitution.  (ECF No. 15).  The parties have filed cross motions for summary judgment on the Act's constitutionality.

## II. LEGAL STANDARD

A court shall grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The parties do not dispute the facts in this case; the sole issue before me is an issue of law. *See Brayshaw v. City of Tallahassee, Fla.*, 709 F. Supp. 2d 1244, 1247 (N.D. Fla. 2010).  I will therefore proceed to resolve this case on its merits through summary judgment.

## III. ANALYSIS

### A. Standing

Plaintiffs bear the burden of establishing standing.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).  To establish standing, a plaintiff must satisfy three elements:  (i) an injury-in-fact, i.e., an invasion of a legally protected interest that is concrete and particularized, and actual or imminent; (ii) causation, i.e., a causal connection between the injury and the conduct complained of; and (iii) redressability, i.e., it must be likely that a favorable decision will redress the injury.  *Id*.

at 560-61.

The State contends that Plaintiffs fail to establish an injury-in-fact.  I agree with the State that Plaintiffs do not establish an injury-in-fact with respect to every provision of § 790.338. Plaintiffs, who consist of physicians and physician groups, have not demonstrated that the following provisions have a chilling effect on their speech:  § 790.338(3), which relates to emergency medical technicians and paramedics; § 790.338(4), which provides that a patient may decline to answer or provide information about firearms and states that the Act does not alter existing law regarding a physician's ability to choose her patients; and § 790.338(7), which applies to insurers.  These provisions do not affect Plaintiffs' free speech rights because they do not apply to practitioners, they do not proscribe practitioners' speech, or they pertain solely to patients' rights to refuse to answer questions.

As to § 790.338(1), (2), (5), and (6), Plaintiffs have established an injury-in-fact.[2]  Plaintiffs contend that they are currently engaging in self-censorship to avoid potential disciplinary action. Plaintiffs state that, as a result of the Act, they are no longer (i) asking patients about firearm ownership, (ii) following-up on routine questions regarding firearm ownership, (iii) providing patient intake questionnaires that include questions about firearms, or (iv) orally counseling patients about firearm safety.  (*See, e.g.*, Schaechter Decl. ¶ 17; Schechtman ¶ 15; Fox-Levine Decl. ¶¶ 10-11; Goodman Decl. ¶ 10).  As I found in my Preliminary Injunction Order, this injury is actual.  *Cf. Int'l Soc'y for Krishna Consciousness of Atlanta v. Eaves,* 601 F.2d 809, 820 (5th Cir. 1979) (holding that members of religious group suffered injury because the group stopped proselytizing or soliciting donations at an airport to avoid losing its permit and stating that the group's members

---

[2]  The State also argues that Plaintiffs do not have standing to challenge § 790.338(2)'s clause that a practitioner "shall respect a patient's right to privacy" and § 790.338(6)'s clause that a practitioner "shall respect a patient's legal right to own or possess a firearm."  Plaintiffs challenge the entirety of each of these provisions.  These clauses are intertwined with others in the same subsection.  I will not separate them for purposes of determining standing.

"have an interest in escaping the solicitation booths, and in knowing exactly how far they can go without being punished").

Defendants argue that Plaintiffs' self-censorship is not objectively reasonable because they face no credible threat of enforcement of the statute. To establish a credible threat of prosecution, a plaintiff must show that: (i) "he seriously wishes to engage in expression that is *at least arguably forbidden* by the pertinent law"; and (ii) "there is at least some minimal probability that the challenged rules will be enforced if violated." *Harrell v. Florida Bar*, 608 F.3d 1241, 1260 (11th Cir. 2010) (internal quotation marks omitted).

Through a series of affidavits, Plaintiffs have shown that they seriously wish to ask their patients about firearms and discuss firearm safety with their patients. The Firearm Owners' Privacy Act at least *arguably* forbids this activity. The Act would at least arguably forbid a physician from using with all of her patients an intake questionnaire that included a question about firearms. A physician who asks questions that a patient may find unnecessarily harassing faces an objective threat of specific future harm, i.e., disciplinary action.

Further, there is at least some minimal probability that the State will enforce the Act. The State has not provided any evidence to show that it does not intend to enforce the law if a patient files a complaint. The Eleventh Circuit has clarified that "[i]f a challenged law or rule was recently enacted, or if the enforcing authority is defending the challenged law or rule in court, an intent to enforce the rule may be inferred." *Harrell*, 608 F.3d at 1257. The legislature enacted the law approximately one year ago, and the State is defending it in this litigation. This Court may therefore infer that the State intends to enforce the rule.

Plaintiffs also meet the causation and redressability requirements for standing. The evidence establishes that Plaintiffs began self-censoring when the law went into effect in June 2011. Passage of the law caused Plaintiffs' injury by chilling their speech. A favorable decision in this litigation in

the form of a declaration that the law is unconstitutional will redress the Plaintiffs' injury.  Plaintiffs would then be free to resume the use of questionnaires including questions about firearm ownership, which would be included in the patient's medical record, and counseling patients regarding firearm safety.

For the reasons provided, I find that Plaintiff have standing to challenge § 790.338(1), (2), (5), and (6).

**B. Ripeness**

The State insists that this Court should wait until a state agency charged with the Act's enforcement has interpreted it.  The doctrines of standing and ripeness "tend to converge," particularly in cases such as this one, which involves pre-enforcement review.  *Elend v. Basham*, 471 F.3d 1199, 1205 (11th Cir. 2006).  To determine whether a claim is ripe, a court must "assess both the *fitness* of the issues for judicial decision and the *hardship* to the parties of withholding judicial review."  *Harrell*, 608 F.3d at 1258.  In conducting this analysis, a court must consider the following factors:  "(1) whether delayed review would cause hardship to the plaintiffs; (2) whether judicial intervention would inappropriately interfere with further administrative action; and (3) whether the courts would benefit from further factual development of the issues presented."  *Ohio Forestry Ass'n, Inc. v. Sierra Club,* 523 U.S. 726, 733 (1998).  This Court is mindful that "[i]n the context of a facial challenge, a purely legal claim is presumptively ripe for judicial review because it does not require a developed factual record."  *Harris v. Mexican Specialty Foods, Inc.*, 564 F.3d 1301, 1308 (11th Cir. 2009).

Plaintiffs' claim is ripe for many of the same reasons that they have standing.  As discussed above, Plaintiffs are currently engaging in self-censorship, even though they have a "specific, serious, and plausible and desire to engage in conduct that arguably would violate the [law]."  *Beaulieu v. City of Alabaster*, 454 F.3d 1219, 1230-31 (11th Cir. 2006) (internal quotation marks

omitted).  Delayed review of this matter would therefore cause hardship to Plaintiffs, who would continue to engage in self-censorship.

I do not find that further factual development of the issues is necessary and this issue is fit for review.  This is a facial challenge to a law enacted approximately one year ago.  Given its recent enactment, it is unlikely that the State would simply decline to enforce the law.

In support of its position that the Act is not ripe for review, the State provides the declaration of Edward Tellechea, counsel to the Board of Medicine, who states that the Board of Medicine must still promulgate administrative rules containing disciplinary guidelines for violations of the law.  (Tellechea Decl. at 1, ECF No. 93-1).  Tellechea explains:

> [t]he guidelines must include a meaningful range of penalties based on the severity and repetition of offenses that include minimum and maximum fines, periods of supervision and probation, conditions of probation, or other allowable penalties such as letters of concern, reprimands, suspensions and revocations. . . . [T]he Board of Medicine[] must promulgate administrative rules containing such administrative guidelines for a specific charge prior to imposing discipline upon any licensee for violating such charge.

(Tellechea Decl. at 1).  The disciplinary rules apparently pertain only to the level of penalty a practitioner may face if she violates the law, not to the interpretation of what constitutes a violation. The declaration does not state that the enforcement of the law is halted until the Board promulgates such rules, i.e., Tellechea does not aver that the State will not prosecute practitioners who violate the law before the disciplinary guidelines are established.  Because Plaintiffs assert a facial attack on the law and there is no evidence that the State will not enforce the law, and in light of the more permissive application of the doctrine of ripeness in the First Amendment context, I find that this issue is ripe for adjudication.  *See Beaulieu*, 454 F.3d at 1227-28; *see also Florida ex rel. McCollum v. U.S. Dep't of Health & Human Servs.*, 716 F. Supp. 2d 1120, 1149 (N.D. Fla. 2010).

The State relies heavily on *Pittman v. Cole*, 267 F.3d 1269 (11th Cir. 2001), to bolster its position.  There, the court considered a challenge to two state bar advisory opinions stating that

judicial candidates would violate ethics rules if they responded to certain questions posed in a Christian Coalition of Alabama's questionnaire on social and political issues. The court held that the issue was not ripe for review because the advisory opinions were not final or binding. *Id.* at 1278-79 ("The informal opinion of the Bar's general counsel does not establish the Bar's policy. The general counsel can say whatever he wants, but unless the Disciplinary Commission agrees, his unofficial statements are not the official policy of the Bar."). Thus, in *Pittman*, there was simply no definitive policy to challenge; the plaintiffs did not challenge the ethical rules themselves and the advisory opinion was not a binding policy statement.[3] In contrast, the plaintiffs here challenge an enacted law, which they contend violates the First Amendment on its face. The duly enacted Act is binding on all Florida practitioners. *Pittman*'s holding and rationale is therefore inapplicable to the facts of this case.

For the reasons provided, I find that Plaintiffs' challenge to the Firearm Owners' Privacy Act is ripe for adjudication.

**C. Facial Challenge to the Law**

    1. <u>Applicable Legal Standard</u>

The Firearm Owners' Privacy Act imposes content-based restrictions on practitioners' speech. It purports to regulate practitioners' inquiries, record-keeping, discrimination, and harassment with respect to one subject matter only—firearm ownership and possession. Under this law, for example, physicians may ask a new patient complaining of a stomachache to fill out an

---

[3] The State also relies on *International Academy of Oral Medicine & Toxicology v. North Carolina State Board of Dental Examiners*, 451 F. Supp. 2d 746 (E.D.N.C. 2006), which it contends is "very similar" to this case. There, the plaintiffs alleged that the Dental Board violated dentists' free speech through regulations regarding the advertising of mercury-related dental practices. *Id.* at 748. The court held that the dispute was not ripe for adjudication because the board's so-called policy on advertising consisted of an informal interpretation of the regulations, which appeared in a newsletter. *Id.* at 751. The plaintiffs did not challenge the regulations themselves, which did not, on their face, prohibit the type of advertising the dentists wanted to make. *Id.* Like *Pittman*, *International Academy of Oral Medicine & Toxicology* is not appicable to the facts of this case.

initial intake questionnaire that includes questions regarding household chemicals, risky recreational

activities, sexual conduct, or drugs and alcohol kept in the home, but not whether the patient owns a

firearm.

Despite the State's arguments to the contrary, the anti-discrimination and anti-harassment

provisions are also content-based.  The State contends that these provisions are analogous to anti-

discrimination provisions in Title VII of the Civil Rights Act and the Americans with Disabilities

Act.  In the context of anti-discrimination laws, the Supreme Court has explained:

> When the basis for the content discrimination consists entirely of the very reason
> the entire class of speech at issue is proscribable, no significant danger of idea or
> viewpoint discrimination exists. Such a reason, having been adjudged neutral
> enough to support exclusion of the entire class of speech from First Amendment
> protection, is also neutral enough to form the basis of distinction within the class.

*R.A.V. v. City of St. Paul, Minn.*, 505 U.S. 377, 388 (1992).  Thus, laws proscribing discrimination

based on certain protected classes, such as gender, race, or disability are permissible—in such cases

the basis for the content discrimination is the reason the entire class of speech is proscribable.  For

the same reasons, hate speech and "fighting words" directed at protected classes are also

proscribable.  *See United States v. Alvarez*, No. 11-210, slip op. at 5 (U.S. Jun. 28, 2012) (Kennedy,

J., opinion).  The provisions at issue here do not proscribe words or conduct directed at an entire

class of speech, such as hate speech, or an entire protected class of individuals, such as those within

a racial group.  Rather, the provisions prohibit discrimination and harassment based on one narrow

subject or viewpoint—the exercise of the right to own and possess a gun.

Finally, the Act's legislative history reinforces the conclusion that the law places restrictions

on only one subject matter—firearm ownership.  The Florida legislature specifically identified

policies encouraging and recommending that physicians ask about firearms as an aspect of the

problem that the law would rectify, and expressed concern or disagreement with practitioners'

firearm safety message.  *See, e.g.*, State of Florida, Final Bill Analysis, CS/CS/HB 155, at 2 (ECF

No. 49-1); State of Florida, H.R. Debate, 2011 Sess. (Apr. 26, 2011) (remarks of Rep. Frank Artiles) ("This is purely a political--a political--and an attack on the constitutional right to own a possessive firearm disguised as a safety concern, and that is a problem. . . . People are not reporting it, but it's happening, and that's why I support this bill.").

"In light of the substantial and expansive threats to free expression posed by content-based restriction [the Supreme Court] has rejected as startling and dangerous a free floating test for First Amendment coverage based on an ad hoc balancing of relative social costs and benefits." *Alvarez*, No. 11-210, slip op. at 4 (Kennedy, J., opinion) (internal quotation marks omitted). Rather, content-based statutes that ban or burden constitutionally protected speech are subject to strict scrutiny. *Solantic, LLC v. City of Neptune Beach*, 410 F.3d 1250, 1258 (11th Cir. 2005).

In *Sorrell v. IMS Health Inc.*, the Supreme Court applied strict scrutiny to a law involving commercial speech—which is normally analyzed under a less demanding standard—because it created a content-based burden on speech. 131 S. Ct. 2653, 2664 (2011) ("[T]he distinction between laws burdening and laws banning speech is but a matter of degree and . . . the Government's content-based burdens must satisfy the same rigorous scrutiny as its content-based bans." (internal quotations omitted)). To survive strict scrutiny, a law must constitute the least restrictive means of advancing a compelling government interest. *Solantic,* 410 F.3d at 1258. A court's determination of whether an interest is compelling, "is not to be made in the abstract, by asking whether fairness, privacy, etc., are highly significant values; but rather by asking whether the *aspect* of fairness, privacy, etc., addressed by the law at issue is highly significant." *Cal. Democratic Party v. Jones*, 530 U.S. 567, 584 (2000). "It is rare that a regulation restricting speech because of its content will ever be permissible." *United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 818 (2000). Content-based statutes, therefore, "are presumptively invalid." *R.A.V.*, 505 U.S. at 382; *accord Ashcroft v. Am. Civil Liberties Union*, 542 U.S. 656, 660 (2004).

Following the principles laid out in *Sorrell*, I applied strict scrutiny to analyze the Firearm Owners' Privacy Act at the preliminary-injunction stage. (Prelim. Inj. Order 13-15). I also determined that the Act did not constitute a permissible regulation of professional speech or occupational conduct that imposed a mere incidental burden on speech. Such regulations govern the access or practice of a profession; they do not burden or prohibit truthful, non-misleading speech within the scope of the profession. *Cf. Thompson v. W. States Med. Ctr.*, 535 U.S. 357, 374-75 (2002); *Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 547-48 (2001); *Conant v. Walters*, 309 F.3d 629, 637-38 (9th Cir. 2002). The Supreme Court has noted, in the context of the attorney-client relationship, that "[s]peech by professionals obviously has many dimensions. There are circumstances in which we will accord speech by attorneys on public issues and matters of legal representation the strongest protection our Constitution has to offer." *Florida Bar v. Went For It, Inc.*, 515 U.S. 618, 634 (1995). By extension, practitioners' truthful, non-misleading speech on matters of preventive medicine should be accorded similar protections.

To provide a complete analysis of the issues involved here, I note that which constitutional standard should be applied in professional speech cases is still an unsettled question of law. In *Gentile v. State Bar of Nevada*, the Supreme Court stated that lawyers' speech involving pending cases could be regulated "under a less demanding standard" than that applied in regulating the press. 501 U.S. 1030, 1074 (1991). The Court held that "[w]hen a state regulation implicates First Amendment rights, the Court must balance those interests against the State's legitimate interest in regulating the activity in question." *Id.* at 1075. To survive, the regulation "must have the requisite 'narrow specificity.'" *Conant*, 309 F.3d at 639 (affirming district court's holding that a state regulation restricting physicians' speech violated the First Amendment, where district court applied the *Gentile* balancing test). I need not decide which standard applies because the State

would not prevail under either test.[4]

    2.  Application of Legal Standard

At the preliminary injunction stage of this litigation, the State's asserted justification for the Firearm Owners' Privacy Act was to prohibit practitioners from forcing patients to disclose information about firearm ownership during the provision of medical care, as well as to prevent practitioners from harassing and discriminating against patients based on their ownership or possession of firearms.  The State now sets forth a somewhat revised justification of the law, maintaining that "Section 790.338 is a run-of-the-mill anti-discrimination law."  According to the State, the record-keeping provision "works in tandem with the prohibitions against discrimination and harassment," and the inquiry-restriction provision "serves to protect the patient from disclosing his or her membership in a class now protected from discrimination and harassment."  (Defs.' Resp. to Mot. for Summ. J. 1; Defs.' Second Am. Mot for Summ. J. 13).

What is curious about this law—and what makes it different from so many other laws involving practitioners' speech—is that it aims to restrict a practitioner's ability to provide truthful, non-misleading information to a patient (or record such information), whether relevant or not at the time of the consult with the patient.  The purpose of preventive medicine is to discuss with a patient topics that, while perhaps not relevant to a patient's medical safety at the time, informs the patient about general concerns that may arise in the future.  Thus, a doctor might discuss the dangers of developing diabetes even with a patient who is within normal weight limits, or the dangers of children riding a bike without a helmet with the parents of an infant, or the dangers of smoking with a non-smoker so that she will not take up that habit.

Bans against truthful, non-misleading speech "usually rest solely on the offensive

---

[4] In *Alvarez*, the Supreme Court justices disagreed on whether the case should be analyzed under strict scrutiny or intermediate scrutiny, but agreed that under either test, the result would be the same.  *Compare* No. 11-210, slip op. at 17 (Kennedy, J., opinion) (applying strict scrutiny), *with* No. 11-210, slip op. at 1-2 (Breyer, J., concurring in judgment) (applying intermediate scrutiny).

assumption that the public will respond 'irrationally' to the truth.  The First Amendment directs us to be especially skeptical of regulations that seek to keep people in the dark for what the government perceives to be their own good."  *Thompson*, 535 U.S. at 375 (quoting *44 Liquormart, Inc. v. Rhode Island,* 517 U.S. 484, 503 (1996)) (internal quotation marks omitted).  With these principles in mind, I will consider each of the State's asserted interests in regulating practitioners' speech.

a. *The State's Asserted Interests*

The State asserts that it has an interest in protecting the exercise of the fundamental right to keep and bear arms.  I do not disagree that the government has such an interest in protecting its citizens' fundamental rights.  The Firearm Owners' Privacy Act, however, simply does not interfere with the right to keep and bear arms.  The State's arguments rest on a legislative illusion.  The Second Amendment right to keep and bear arms refers to the right to "retain," "to have in custody," "to hold," and "to carry" weapons, including firearms.  *See District of Columbia v. Heller*, 554 U.S. 570, 582-83, 584 (2008) ("'keep arms' was simply a common way of referring to possessing arms").  The law at issue here does not affect nor interfere with a patient's right to continue to own, possess, or use firearms.  *Cf. id.* at 628-29 (law that creates blanket ban on firearm possession and use violates Second Amendment).  Protecting the right to keep and bear arms is irrelevant to this law; therefore, I do not find that it is a legitimate or compelling interest for it.

The State next contends it has an interest in protecting individuals "from barriers to the receipt of medical care arising from discrimination or harassment based on firearm ownership." (Defs.' Second Am. Mot for Summ. J. 12).  I acknowledge that the government has a legitimate and compelling interest in protecting its citizens from some types of discrimination or harassment.  Federal and state laws prohibiting discrimination based on certain protected classes or forms of speech reflect the government's concern with protecting individuals from certain neutral classes of

speech.  *See R.A.V.*, 505 U.S. at 388.

The State provides little more than anecdotal information, however, to support its contention that individuals are suffering harassment and discrimination on the basis of firearm ownership. There is no evidence that such alleged harassment and discrimination is widespread or pervasive.  A concern for some patients who may be offended or uncomfortable by questions regarding firearm ownership is insufficient to justify this law.  *See Sorrell*, 131 S. Ct. at 2669 ("'Some doctors in Vermont are experiencing an undesired increase in the aggressiveness of pharmaceutical sales representatives,' the Vermont Legislature found, 'and a few have reported that they felt coerced and harassed.' . . .  It is doubtful that concern for 'a few' physicians who may have 'felt coerced and harassed' by pharmaceutical marketers can sustain a broad content-based rule like § 4631(d)."). Indeed, "[m]any are those who must endure speech they do not like, but that is a necessary cost of freedom."  *Id*.  Thus, while the State may ordinarily have a legitimate and compelling interest in protecting its citizens from some types of discrimination or harassment, the State has not demonstrated that it has a legitimate or compelling interest in protecting citizens from discrimination or harassment on the basis of firearm ownership or possession.

Additionally, the State's interest in preventing discrimination is dubious because the State itself acknowledges that the law does not prevent a physician from terminating the doctor-patient relationship if a patient refuses to answer questions regarding firearm ownership.  The anti-discrimination provision therefore provides only remote, if any, support for the State's asserted purpose.  *See FCC v. League of Women Voters of Cal.*, 468 U.S. 364, 396 (1984) (finding the substantiality of the government's asserted interest "dubious" where the law at issue provided "only ineffective or remote support for the government's purpose").

The State further asserts that it has an interest in protecting individuals' privacy rights related to firearm ownership and possession.  Existing safety regulations already circumscribe the

privacy protections over the limited information this law seeks to protect—the fact that a patient owns or possesses a firearm.  Information regarding firearm ownership is not sacrosanct; federal and state statutes regulate firearm ownership, possession, and sale, and require firearm owners to provide personal information in certain circumstances as a condition for obtaining a firearm or certain licenses.  *See, e.g.*, Fla Stat. Ch. 790; 18 U.S.C. § 922; *cf. Jones*, 530 U.S. at 585 (holding government's stated interest in protecting privacy of voter affiliation information was not compelling, and noting that such information was not sacrosanct, as evidenced by federal statutes requiring declaration of party affiliation as a condition of appointment to certain offices).  The State notes that the Florida legislature has provided for several confidentiality protections for information gathered during gun purchases and applications for certain licenses.  The State concludes that "[t]hese measures indicate that the Legislature has already recognized the need for heightened confidentiality protection on information concerning gun ownership."  (Defs.' Second Am. Mot for Summ. J. 13).  I recognize that the State has a legitimate interest, although perhaps not a compelling one, in protecting patients' privacy regarding their firearm ownership or use.[5]

Finally, the State asserts that it has an interest in the regulation of professions, such as the provision of medical care.  Plaintiffs stress that the regulation at issue here restricts their provision of medical care by limiting their ability to make inquiries of their patients to determine what issues are relevant to their care and may require further consultation. Upon review of the evidence presented, I cannot conclude that the regulation of professions is a compelling state interest, although it may be a legitimate one.

---

[5] Even accepting that the State has a legitimate or compelling interests in protecting patients' privacy interest in information about firearm ownership and possession, the State fails to provide any evidence that the confidentiality of this information is at risk.  *Cf. Whalen v. Roe*, 429 U.S. 589, 599-601 (1977).  Further, I find, and the State does not convince me otherwise, that this interest is adequately protected by the Act's provision that allows a patient to simply refuse to answer any questions about firearm ownership.

b. *Balancing of Interests under Gentile*

Courts have recognized that the free flow of truthful, non-misleading information is critical within the doctor-patient relationship.  *See, e.g.*, *Trammel v. United States*, 445 U.S. 40, 51 (1980) ("[T]he physician must know all that a patient can articulate in order to identify and to treat disease; barriers to full disclosure would impair diagnosis and treatment."); *Conant*, 309 F.3d at 636 ("An integral component of the practice of medicine is the communication between a doctor and a patient.  Physicians must be able to speak frankly and openly to patients."); *see also Sorrell*, 131 S. Ct. at 2664 ("A consumer's concern for the free flow of commercial speech often may be far keener than his concern for urgent political dialogue. . . . That reality has great relevance in the fields of medicine and public health, where information can save lives.").  The State, through this law, inserts itself in the doctor-patient relationship, prohibiting and burdening speech necessary to the proper practice of preventive medicine, thereby preventing patients from receiving truthful, non-misleading information.  *See Conant*, 309 F.3d at 638.  This it cannot do.  *Cf. Velazquez*, 531 U.S. at 544, 547-49 (2001) (invalidating provision that prevented attorneys receiving federal funds from challenging existing welfare laws); *Thomas v. Collins*, 323 U.S. 516, 544 (1945) (Jackson, J., concurring) ("[T]he state may prohibit the pursuit of medicine as an occupation without its license, but I do not think it could make it a crime publicly or privately to speak urging persons to follow or reject any school of medical thought.").

In balancing the State's legitimate interests in regulating inquiries regarding firearm ownership and possession against the practitioners' free speech rights when communicating with patients in the practice of preventive medicine, I find that the inquiry restriction, record-keeping, anti-discrimination, and anti-harassment provisions cannot stand.

Although the State has a legitimate interest in protecting individuals from any existing barriers to the receipt of medical care arising from discrimination or harassment based on firearm

ownership, it has not provided any evidence—beyond a handful of anecdotes—to show that any real barriers actually exist or are widespread and pervasive.  Even if they were, this law does not remedy the precise type of incident (such as the one in Ocala) that the legislators apparently meant to cure— the State admits that the Act does not prevent a physician from terminating the doctor-patient relationship if a patient refuses to answer questions regarding firearm ownership.

I recognize that the State may have, in the abstract, a legitimate interest in protecting patients' privacy regarding their firearm ownership or use.  The State, however, fails to provide any evidence that the confidentiality of this information is at risk.  *Cf. Whalen v. Roe*, 429 U.S. 589, 599-601 (1977).  If a patient does not want to provide the information, she may simply refuse to do so.  If a patient discloses whether she owns or possesses a firearm and the practitioner includes that information in her file, state and federal laws pertaining to the confidentiality of medical records will protect that information.  Although the State argues that someone later reading the file might discriminate or harass a patient based on her ownership or possession of a firearm, this appears to be nothing more than conjecture.  There is no evidence that such discrimination or harassment has ever occurred.

I also acknowledge that the State has a legitimate interest in regulating the medical profession.  This law, however, does not have the requisite "narrow specificity."  The Act does not impose a mere incidental burden on speech.  Rather, truthful, non-misleading speech is the direct target of the Act.  *Cf. Gentile*, 501 U.S. at 1034.  I am unconvinced that the State's interest in regulating the medical profession outweighs practitioners' free speech rights.

This law chills practitioners' speech in a way that impairs the provision of medical care and may ultimately harm the patient.  *Cf. Velazquez*, 531 U.S. at 546.  A physician may ask in an initial questionnaire about lifestyle choices or high-risk activities even though the physician does not, at that time, have a good faith belief that the information is relevant to that patient's medical care.  The

purpose of the inquiry is so that the practitioner can determine what subject matters require further follow-up in the practice of preventive medicine.   The restrictions at issue here are especially problematic because, as Plaintiffs note, there may be cases where, unless the practitioner makes an initial inquiry about firearms (albeit with no good faith basis, at the time of the questioning, that it is relevant), the patient may not know to raise the issue herself and may not receive appropriate, possibly life-saving, information about firearm safety.   These considerations persuade me that the balance of interests tip significantly in favor of safeguarding practitioners' ability to speak freely to their patients.   As the Supreme Court recently stated:   "The mere potential for the exercise of [governmental censorial power] casts a chill, a chill the First Amendment cannot permit if free speech, thought, and discourse are to remain a foundation of our freedom."   *Alvarez*, No. 11-210, slip op. at 11 (Kennedy, J., opinion).

### c.  *The Act is not the Least Restrictive Means of Achieving the State's Ends*

I also find that the inquiry restriction, record-keeping, anti-discrimination, and anti-harassment provisions do not consist of the least restrictive means to accomplish the State's ends. The non-objectionable portions of the law already adequately protect the privacy interests that the State seeks to ensure.   Under § 790.338(4), a patient may decline to answer or provide any information regarding firearm ownership or possession.   Under the first clause of § 790.338(2), the practitioner must respect a patient's right to privacy.   If the patient refuses to provide the information, there is nothing for the practitioner to record in the patient's medical record.   State and federal laws further protect the confidentiality of patients' medical records.   *See, e.g.*, Health Ins. Portability and Accountability Act of 1996, 42 U.S.C. § 1320d, *et seq*.; Fla. Stat. § 456.057.   As to the anti-harassment and anti-discrimination provisions, a content-neutral provision would be an available, effective alternative.   Upon careful review of the challenged provisions of the Firearm Owners' Privacy Act and the parties' arguments, I find that the inquiry restriction, record-keeping,

anti-discrimination, and anti-harassment provisions do not pass constitutional muster.

**D.  Vagueness**

Plaintiffs challenge the inquiry restriction, record-keeping, anti-discrimination, and anti-harassment provisions on the ground that they are unconstitutionally vague.  Plaintiffs argue that the inquiry restriction and record-keeping provisions are unconstitutionally vague because they do not define what constitutes "relevant to the patient's medical care or safety, or the safety of others." Plaintiffs also argue that the anti-discrimination and anti-harassment provisions are unconstitutionally vague because they fail to give practitioners sufficient notice of what constitutes prohibited conduct, and the Act fails to define the terms "unnecessarily harassing" and "discriminate."

"The void-for-vagueness doctrine reflects the principle that a statute which either forbids or requires the doing of an act in terms so vague that persons of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process of law."  *Harris*, 564 F.3d at 1310 (quoting *Roberts v. U.S. Jaycees*, 468 U.S. 609, 629 (1984)) (internal quotation marks omitted).  A law is unconstitutionally vague "if it is so vague and standardless that it leaves the public uncertain as to the conduct it prohibits or leaves judges and jurors free to decide, without any legally fixed standards, what is prohibited and what is not in each particular case."  *Id.* at 1311 (quoting *Giaccio v. Pennsylvania*, 382 U.S. 399, 402-03 (2003)).  The vagueness of content-based regulations on speech "raises special First Amendment concerns because of its obvious chilling effect on free speech."  *Reno v. Am. Civil Liberties Union*, 521 U.S. 844, 871-72 (1997).

The State does not respond to Plaintiffs' arguments that the phrase "relevant to the patient's medical care or safety, or the safety of others," which appears in § 790.338(1) and (2), is unconstitutionally vague.  Plaintiffs contend that, in the context of preventive medicine, information

about a patient's use or possession of firearms is always relevant.  However, they note, correctly, that to read the relevance standard in that way would render that clause meaningless or superfluous.  *See In re Davis*, 565 F.3d 810, 823 (11th Cir. 2009) ("We cannot read statutory language in a way that renders it wholly meaningless or nonsensical.").  I agree that this statutory language fails to give practitioners sufficient guidance.  *Cf. Gentile*, 501 U.S. at 1048-49.  In the context of preventive medicine, which is a forward-looking practice, it is unclear whether the clause means "relevant at the time of the consult with the patient" or "relevant at any time in the future."  The uncertainty regarding this standard is especially problematic in this case, where it has a chilling effect on speech, and, by extension, on the effectiveness of the practice of preventive medicine.  Given the vague contours of what the statute prohibits, "it unquestionably silences some speakers whose messages would be entitled to constitutional protection."  *Reno*, 521 U.S. at 874.  Consequently, these provisions "lack[] the precision that the First Amendment requires when a statute regulates the content of speech."  *Id*.  I find that these provisions are void for vagueness.

As to the anti-discrimination and anti-harassment provisions, the State argues that, while not expressly defined in the Act, the terms "discriminate" and "harass" have ordinary meaning that are readily clear to persons of common intelligence.  I agree.  These terms are sufficiently clear to place practitioners on notice of what kind of conduct is prohibited.  However, the anti-harassment provision contains an adverb that renders it vague.  *See Myers v. TooJay's Mgmt. Corp.*, 640 F.3d 1278, 1285 (11th Cir. 2011) ("[A] statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant." (quoting *Corley v. United States*, 556 U.S. 303 (2009))).  Section 790.338(6) provides that a practitioner "should refrain from *unnecessarily* harassing a patient about firearm ownership during an examination."  What constitutes "unnecessary harassment" is left to anyone's guess.  It also begs the question—is there conduct that would be permissible because it constitutes necessary harassment?  The anti-

22

harassment provision does not provide fair notice as to what range of conduct it prohibits.  For this reason, it is void for vagueness.

**E.  Severability**

The State urges me to sever any invalid portions of the law.  Severability of a state statute is a question of state law.  *See Coral Springs Street Sys., Inc. v. City of Sunrise*, 371 F.3d 1320, 1347 (11th Cir. 2004).  "Florida law clearly favors (where possible) severance of the invalid portions of a law from the valid ones."  *Id*.  "The doctrine of severability is derived from the respect of the judiciary for the separation of powers, and is designed to show great deference to the legislative prerogative to enact laws."  *Id*. (internal quotation marks omitted).  "Severability is not possible, however, when the taint of an illegal provision has infected the entire enactment, requiring the whole unit to fail."  *Id*. (internal quotation marks omitted).  Under Florida law, a court must consider the following factors to determine whether severability is possible:

> (1) the unconstitutional provisions can be separated from the remaining valid provisions, (2) the legislative purpose expressed in the valid provisions can be accomplished independently of those which are void, (3) the good and the bad features are not so inseparable in substance that it can be said that the Legislature would have passed the one without the other and, (4) an act complete in itself remains after the invalid provisions are stricken.

*Id*. at 1348.

The Firearm Owners' Privacy Act contains seven subsections.  As I noted above, Plaintiffs do not have standing to challenge § 790.338(3), (4), and (7).  These provisions can be severed from the rest of the statute.[6]  The Florida legislature's purpose in regulating emergency medical personnel and insurers can be accomplished independently of the rest of the provisions; it regulates a different group of individuals and entities.  The legislature's purpose in permitting patients to maintain as private or confidential information about firearms private can be accomplished through subsection (4), which provides that a patient may decline to disclose such information.

---

[6] Plaintiffs have not provided any substantive argument in opposition to allowing these provisions to remain.

Section 790.338(3), (4), and (7) are separable in substance from the invalid portions of the law; it cannot be said that the legislature would never have passed these subsections without the invalid portions of the law.  A complete act remains even if the invalid portions of the law are stricken.

The State also argues that certain clauses in § 790.338(2) and (6) can be severed from any invalid portions of those subsections.  Specifically, the State seeks to salvage § 790.338(2)'s clause that a practitioner "shall respect a patient's right to privacy" and § 790.338(6)'s clause that a practitioner "shall respect a patient's legal right to own or possess a firearm."  "The fact that an invalid portion of a statute is not self-contained in separate sections does not prohibit the court from applying the severability rule to strike the invalid portion and to preserve the rest of the enactment." *Hershey v. City of Clearwater*, 834 F.2d 937, 939 (11th Cir. 1987).  In fact, the Florida Supreme Court has, in other cases, struck a sentence or even a phrase while preserving the remainder of a statute. *Id*.

I do not find, however, that a judicial nip and tuck can preserve these clauses.  *See Jones v. Smith*, 474 F. Supp. 1160, 1169 (S.D. Fla. 1979).  Although the clauses reflect the legislature's concern with protecting patients' privacy with regard to firearms, standing alone, they fail to provide any standards for practitioners to follow.  They would simply be too vague and overbroad.  Further, a provision complete in itself does not remain after the invalid portions are stricken.

### IV. CONCLUSION

For the reasons provided, the Defendants' Second Amended Motion for Summary Judgment (ECF No. 93) is **GRANTED in part and DENIED in part**, and the Plaintiffs' Motion for Summary Judgment (ECF No. 86) is **GRANTED**.[7]  The State is permanently enjoined from enforcing § 790.338(1), (2), (5), and (6).  The State is also permanently enjoined from enforcing

---

[7] I have not addressed Plaintiffs' argument that the law is overbroad because it would not change the result in this case.

§ 790.338(8), to the extent that it provides that violations of § 790.338(1) and (2) constitute grounds for disciplinary action. The State is further permanently enjoined from enforcing § 456.072(1)(mm), to the extent that it provides that violations of § 790.338(1), (2), (5), and (6) shall constitute grounds for which disciplinary actions specified under § 456.072(2) may be taken. A separate judgment will be issued forthwith pursuant to Rule 58 of the Federal Rules of Civil Procedure.

**DONE and ORDERED** in chambers at Miami, Florida, this 29th day of June 2012.

_Marcia G. Cooke_

MARCIA G. COOKE
United States District Judge

Copies furnished to:
*William C. Turnoff, U.S. Magistrate Judge*
*Counsel of record*